**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert NEAPOLITAN,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Thomas COVELLO, Sr., Ralph Mascio, Jr., Joseph W. Hlavach, Antoine A. Turner, Victor R. Meadows, and Clement A. Messino, Defendants-Appellants.**

Nos. 85–1899, 85–2131 to 85–2136.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1986.

Decided May 16, 1986.

Rehearing Denied June 11, 1986.

John A. Dienner, III, Pierce, Lydon Griffin & Montana, Ronald J. Clark, Ellen G. Robinson, Burke, & Smith Chtd., Robert M. Stephenson, Cotsirilos & Crowley, Ltd. Shelia M. Murphy, Chicago, for defendant-appellant.

Sara Criscitelli, Sp. Counsel, OCR Section, U.S. Dept. of Justice, Ben Franklin Station, Washington, D.C., William R. Hogan, Asst. U.S. Atty., (Anton R. Valukas, U.S. Atty.), Chicago, for plaintiff-appellee.

Before WOOD, POSNER, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

■ These two unrelated cases have been united because they arise out of similar factual settings, auto theft rings in the Chicago area, and because they both pose the question of the scope of a conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d). Through these appeals we become the latest in a string of circuits to struggle with what degree of relationship between the defendant and the alleged predicate criminal acts is sufficient to support a conviction for RICO conspiracy under § 1962(d). Based on the literal approach to RICO interpretation adopted by this circuit in *Haroco v. American National Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir.1984), *aff'd,* — U.S. —, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), we hold that a defendant violates section 1962(d) when he or she enters into an agreement with knowledge that the goal of the conspiracy is the commission of a RICO violation, that is to "conduct or participate in the affairs of an enterprise through a pattern of racketeering activity." Pursuant to this interpretation the convictions in these two cases are affirmed. Nevertheless it is important to emphasize the differences between RICO conspiracy and conspiracy prohibited by 18 U.S.C. § 371 and the special burden RICO conspiracy imposes on both the crafting of indictments and the conducting of trials.

## I.

The convictions in these two cases stem from the widespread practice of stealing cars, breaking them down to their component parts, and selling the auto parts in interstate commerce. *See* 18 U.S.C. § 2314. What distinguishes the cases from each other factually is the relationship of the defendants to the central crime of auto theft: *Neapolitan* involves police officers protecting the auto ring, while *Covello* involves the central figures in a separate "chop shop" operation.

### The Conviction of Robert Neapolitan

Robert Neapolitan, along with his two co-defendants, Robert Cadieux and Ronald Sapit, was employed as an investigator for the Cook County Sheriff's Police Department until his indictment in 1984 on five counts of mail fraud and one count of racketeering conspiracy. The indictment, in conjunction with the evidence adduced at trial, presents a picture of police corruption in which Officers Cadieux and Sapit at once encouraged known car thieves to supply them with automobiles and establish a "chop shop," while also soliciting bribes in the form of auto parts and cash in exchange for police protection. The evidence linking Neapolitan to the scheme shows that he entered the arrangement after its establishment and that his involvement was limited.

Neapolitan was named in four of the five alleged acts of mail fraud but was acquitted of all the mail fraud counts by the district judge. Neapolitan then went to trial as the sole defendant charged only with the RICO conspiracy—both Sapit and Cadieux pleaded guilty earlier. The government's theory under section 1962(d) can be summarized briefly. Sapit, Cadieux, and Neapolitan were alleged to have conspired to conduct the affairs of the sheriff's office, the RICO "enterprise" for purposes of this case, *see* 18 U.S.C. § 1961(4), through a pattern of racketeering activity.

The predicate acts constituting the pattern under 18 U.S.C. § 1961(5) were the four alleged acts of mail fraud and eleven specified acts of bribery in violation of Ill.Rev. Stat. ch. 38, § 33–1(d), (e). Of the listed acts of bribery, Neapolitan was identified as having been involved in only one. Thus, with the dismissal of the mail fraud counts against him, Neapolitan's involvement in the conspiracy, as it is sketched in the indictment, is limited to the solicitation of one cash bribe.

At trial the government presented evidence concerning the activities of all three of the indicted police officers, including evidence of Neapolitan's alleged participation in the "fixing" of a pending case, in Cadieux's attempt to sell the front end of a 1980 Cadillac El Dorado, and in the process of obtaining a new "clean" title for a 1977 Ford pick-up truck. The jury found Neapolitan guilty of a RICO conspiracy and he was sentenced to a period of one year incarceration.

*The Convictions of Covello, Mascio, Hlavach, Turner, Meadows, and Messino.*

Defendants Thomas Covello, Sr., Ralph Mascio, Jr., Joseph W. Hlavach, Antoine A. Turner, Victor Meadows, and Clement A. Messino were all alleged to have been involved in varying degrees in a large scale "chop shop" operation centered around two salvage yards in Chicago, Ashland Auto Wreckers and M & J Auto Wreckers.[1] The grand jury returned an eight-count indictment that charged the defendants with seven counts of interstate transportation of stolen goods in violation of 18 U.S.C. § 2314 and one count of RICO conspiracy. According to the indictment and the government's briefs on appeal, the evidence, acquired after a prolonged surveillance, established that all the defendants were members of a *"de facto"* RICO enterprise dedicated to the "processing" of stolen cars. The operations of this auto ring

*qua* enterprise encompassed all aspects of the "chop shop" business.

The hub of the alleged operations was the two salvage yards owned by defendants Covello and Mascio. From these supposedly legitimate businesses Covello and Mascio directed the theft of particular models of cars in order to supply the yards with a constant supply of parts. According to the government, defendant Messino often arranged the theft of specific automobiles through a large cadre of auto thieves, including defendants Meadows, Hlavach, and Turner. The cars would generally be stripped prior to any actual contact with the yards, although it is claimed that at times Covello and Mascio purchased stolen cars directly and had them disassembled at the yards. Both Meadows and Hlavach are alleged to have been involved in the disassembly of automobiles on a sporadic basis. The thieves and disassembly crews would load the parts destined for the yards onto vans, the drivers of which often included Turner and Meadows, and transport the parts to Covello and Mascio during "non-business" hours.

Once the parts were at the yards, all vehicle identification numbers would be removed or obscured and the parts would be sorted based upon type and, for body parts, color. The thieves and the deliverers would then generally receive a check from the yard made payable to a false name which could be cashed at a pair of currency exchanges hospitable to the operation. In order to cope with the large influx of parts the yards, according to the government, regularly transported parts in trucks frequently driven by Meadows or Turner to a warehouse owned by M & J Auto Wreckers in Schereville, Indiana. These parts were then allegedly sold to salvage yards both within and outside Illinois; the largest purchaser was claimed to be Piper Motor Co., Inc. of Bloomfield, Iowa. In accord with their standard practice, the yards would

---

1. In addition to the six defendants involved in this appeal ten other people and two corporations were indicted. The ten individuals and one of the corporations pleaded guilty to interstate transportation of stolen property and re-

ceived varying amounts of prison sentences, probation periods, and fines. The final corporate entity pleaded nolo contendre to interstate transportation of stolen property and paid a fine.

allegedly receive payment in the form of checks issued to fictitious payees that could be cashed at the cooperating currency exchanges.

After a jury trial, all six defendants were found guilty of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d), the RICO conspiracy count. Of the remaining seven substantive counts relating to the transportation of specific stolen parts, only Covello was convicted of all seven, for which he received concurrent eight year sentences, and five years probation. Mascio was convicted of six counts of interstate transportation of stolen goods and was sentenced to concurrent terms of four years imprisonment followed by five years probation. Meadows was convicted on two substantive counts, in addition to the RICO charge, and received concurrent three year prison terms followed by five years probation. Turner was convicted only of one count of interstate transport; his four year sentence was suspended in favor of five years conditional probation. The jury acquitted Hlavach and Messino on all seven substantive counts. Each received a four year prison sentence on the conspiracy count, although Hlavach's was suspended in favor of five years probation.

## II.

The defendants in both these cases were convicted of RICO conspiracy pursuant to jury instructions which required that the jury find that the defendants conspired to violate section 1962(c). It was not necessary that the defendants personally agreed to violate RICO. Thus, the district court did not require that the defendants agreed personally to commit two predicate acts in a context that implicates RICO. It was sufficient for the defendant to join a conspiracy, the goal of which was the conduct of or participation in the affairs of an enterprise through a pattern of racketeering activity. Neapolitan and those defendants in the Covello case who were acquitted of the non-RICO counts take issue with the

district court's characterization of a RICO conspiracy. They contend that section 1962(d) is implicated only when a defendant agrees personally to commit two predicate acts. Furthermore, they argue that even should a broader standard than they proposed be adopted by this court the jury instructions failed to require an "agreement," an element that must be present in any conspiracy charge.

The issues presented in the appeal cannot be easily resolved, and have caused a clear division among the circuit courts that have considered the issue. *See Adams v. United States,* — U.S. —, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985) (White, J., joined by Burger, C.J., dissenting from a denial of certiorari in a recent RICO conspiracy case). The First and Second Circuits have taken the position that a section 1962(d) conspiracy to violate section 1962(c) requires an agreement to personally commit two acts of racketeering activity. *See United States v. Ruggiero,* 726 F.2d 913, 921 (2d Cir.), *cert. denied sub nom., Rabito v. United States,* — U.S. —, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Winter,* 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983). In contrast, four other circuits require only an agreement that members of the conspiracy will violate section 1962(c) through the commission of two proscribed acts. *See United States v. Joseph,* 781 F.2d 549, 554 (6th Cir.1986); *United States v. Adams,* 759 F.2d 1099, 1116 (3d Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Tille,* 729 F.2d 615, 619 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984); *United States v. Carter,* 721 F.2d 1514, 1529 (11th Cir.), *cert. denied sub nom., Morris v. United States,* — U.S. —, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). In fact the Justice Department itself appears to have not resolved its approach. *Compare* U.S. Department of Justice, Criminal Division, *Racketeer Influenced and Corrupt Organizations (RICO): A Manual for Federal Prosecutors* 72 (1985) ("As of mid-1985, it is the policy of the Organized Crime and

Racketeering Section that every defendant in a proposed RICO conspiracy count must be shown to have agreed personally to commit two or more racketeering acts"), *with* the Department of Justice position in the present case.

Our analysis of section 1962(d) is guided by two rules of RICO construction. First, the Supreme Court has consistently adhered to a broad, literal reading of the statute. "This is a lesson not only of Congress' self-consciously expansive language and overall approach, ... but also of its express admonition that 'RICO is to be liberally construed to effectuate its remedial purposes,' Pub.L. 91–452, § 904(a), 84 Stat. 947." *Sedima, S.P.R.L. v. Imrex Co.,* — U.S. —, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). *See United States v. Turkette,* 452 U.S. 576, 586–87, 101 S.Ct. 2524, 2530–31, 69 L.Ed.2d 246 (1981). *See also Haroco,* 747 F.2d at 398 ("[I]n RICO, we confront a statute which is not ambiguous but which is, above all, deliberately and extraordinarily broad."). Second, and in some sense more important, it must be stressed that RICO is a remedial, as opposed to substantive, statute. *See Sedima,* 105 S.Ct. at 3286–87; *Turkette,* 452 U.S. at 589, 101 S.Ct. at 2531. *See also* The Statement of Findings of the Organized Crime Control Act of 1970, 84 Stat. 923 (Congressional purpose is "to seek the eradication of organized crime in the United States ... by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crimes."). The provisions of section 1962 do not create "new crimes" but serve as the prerequisites for the invocation of increased sanctions for conduct which is proscribed elsewhere in both federal and state criminal codes. *See* Blakey & Gettings, *Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts-Criminal and Civil Remedies,* 53 Temp.L.Q. 1009, 1021 (1980) ("RICO is not a criminal statute; it does not make criminal conduct that before its enactment was not already prohibited, since its application depends on the existence of 'racketeering activity' that violates an independent criminal statute. In addition, its standards of unlawful, *i.e.,* criminal or civil conduct are sanctioned by both criminal and civil remedies. RICO, in short, is a 'remedial' statute."). Thus, the use of the term "RICO conspiracy," to the extent it is used to refer to a substantive offense that is distinct from any other conspiracy under 18 U.S.C. § 371, is to some extent a misnomer. Section 1962(d), like the section's other provisions, is only applicable when the defendant has violated other laws in a context that implicates RICO.

As an analytical starting point for divining the meaning of this aspect of the RICO statute, the defendants in both cases were charged with conspiring, as proscribed by section 1962(d), which provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section,

to violate section 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Thus, to borrow a mode of analysis from the Eleventh Circuit's opinion in *Carter,* 721 F.2d at 1529, these two statutory provisions, when read together, "speak only to 'conspiring to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity, *i.e.,* two acts of racketeering activity within at least ten years of each other.'" The task is to decide what this less than pellucid language means. The *Carter* court held that the natural reading of the statute is that any particular defendant need only agree that he and his co-conspirators will operate an

enterprise through the commission of two predicate acts.[2]

The decision in *Carter* can be viewed as resting on three basic analytical premises. First, Congress did not explicitly impose through the language of the statute any requirement of agreement personally to commit two predicate acts. Second, the addition of a requirement of an agreement personally to commit the acts would frustrate the Congressional policy of broadening the scope of remedies available to fight organized crime. Finally, RICO was enacted "against the backdrop of hornbook conspiracy law." *Carter*, 721 F.2d at 1529 (citing *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir.1978)).[3] Under classic conspiracy law, agreeing to the commission of the conspiracy's illegitimate objectives constitutes the crime. The goal of a RICO conspiracy as defined by section 1962(d), is a violation of RICO. The defendant need only agree to a single violation of RICO; he need not agree personally to violate the statute. The *Carter* analysis has been embraced by the Third Circuit, the Sixth Circuit, and the Ninth Circuit. *See United States v. Joseph*, 781 F.2d 549, 554 (6th Cir.1986); *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Tille*, 729 F.2d 615, 619 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984).

In contrast to *Carter*, the First and Second Circuits have, without extensive analysis, adopted a requirement of agreement personally to commit predicate acts. *See Ruggiero*, 726 F.2d at 921; *Winter*, 663

**2.** 721 F.2d at 1529 n. 22:

> The natural reading of this language is that "through a pattern of racketeering activity" modifies the preceding language "the conduct of such enterprise's affairs," rather than, as appellants urge, "conspiring to conduct or participate."

**3.** The Fifth Circuit opinion in *Elliott* is at once the seminal discussion of RICO conspiracy and, in many ways, the root of the current controversy. Both the *Carter* court, on one side, and the First Circuit in *Winter* on the other, have ground their interpretations on *Elliott*. However, a reading of *Elliott* in conjunction with the later case of *United States v. Sutherland*, 656 F.2d 1181 (5th Cir.1981) reveals that the Fifth Circuit had not definitively resolved this issue. The predominate question faced in *Elliott* was the extent to which multiple conspiracies can be grouped together under the RICO enterprise conspiracy theory. This issue relates to the ability of the government to link those associated with the enterprise but not involved in a particular criminal activity or a conspiracy to commit those crimes. The *Sutherland* court interpreted *Elliott* to require multiple conspiracies to be linked by a common objective, the violation of RICO, rather than association with a common enterprise in order to come within the strictures of section 1962(d). 656 F.2d at 1191–93.

The Fifth Circuit has determined that in enacting section 1962(d) Congress did not radically alter traditional conspiracy doctrine except to the extent that it proposed a dramatically new conspiratorial objective. An agreement merely to commit the predicate offenses would not be sufficient to support a RICO conspiracy. Nor is it sufficient if the defendants merely participate in the same enterprise. This is so because under RICO, it is an agreement "to conduct or participate ... in the conduct of [an] enterprise's activities" through the commission of predicate offenses that is prohibited, not an agreement to commit a pattern of racketeering activity alone. "[T]he key element is proof that the various crimes were performed in order to assist the enterprise's involvement in corrupt endeavors." Consequently, we agree with the Fifth Circuit that Congress intended that "a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single 'enterprise' conspiracy" if the defendants have agreed to commit a substantive RICO offense. *United States v. Riccobene*, 709 F.2d 214, 224–25 (3d Cir.) (citations omitted), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). *See also* Blakey and Goldstock, *'On the Waterfront': RICO and Labor Racketeering*, 17 Am. Crim.L.Rev. 341, 360–62 (1980).

This, however, does not answer the question of how the defendant must manifest his agreement to the proscribed objective. On this point the court in *Elliott* stated:

> [t]o be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise *through the commission of two or more predicate crimes*.

571 F.2d at 903 (emphasis in original). There can be no quarrel with this conclusion as far as it goes, but it does not resolve the question of what this somewhat imprecise language means. Thus the arguments on both sides of the issue at hand must be evaluated for their efficacy in explicating *Elliott* not for their reliance upon it.

F.2d at 1136. Serving as the basis for these decisions, and the arguments of the defendants, are a series of RICO conspiracy cases, including this court's decision in *United States v. Martino*, 648 F.2d 367 (5th Cir.1981), which reached somewhat nebulous conclusions. The holdings of these cases with regard to the issue before this court is summarized in the following quote from *United States v. Bright*, 630 F.2d 804, 834 (5th Cir.1980):

> To be convicted of a conspiracy to violate RICO there must be proof that the individual, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes.

*See Melton*, 689 F.2d at 683; *United States v. Tillett*, 763 F.2d 628, 633 (4th Cir.1985); *United States v. Phillips*, 664 F.2d 971, 1038–39 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Martino*, 648 F.2d 367, 395–96 (5th Cir.1981), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982); *United States v. Elliott*, 571 F.2d 880, 901–03 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). *See also United States v. Lee Stoller Enterprises, Inc.*, 652 F.2d 1313, 1320–21 (7th Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981). Clearly the question of what the language quoted above means has not been addressed by the cases which serve as the basis for interpreting section 1962(d) as requiring an agreement of personal commission. *See supra* note 3.

■ Because of the lack of an extensive development of the First and Second Circuit approach the issue before this court is in a sense not well framed. Notwithstanding any shortcomings in the level of the debate, we conclude that the *Carter* approach is more appropriate. While there is some force to the semantic logic applied to the statutory language by the Eleventh Circuit, *see supra* note 2, the strength of that interpretation lies in its adherence to

the nature and purpose of RICO. The fallacy of the approach urged by the defendants (and as adopted by the First and Second Circuits) was revealed by counsel for Hlavach at oral argument when she argued that a RICO conspiracy, because of the increased severity of the penalties, must be different in kind than a section 371 conspiracy. This position, despite its initial appeal, ignores the fundamental tenet of RICO construction discussed above; namely, that RICO creates new remedies for substantive crimes which are carried out in a specified context. The statute does not create a new type of crime; it establishes prerequisites for the imposition of harsher penalties. Thus, a conspiracy to violate RICO should not require anything beyond that required for a conspiracy to violate any other federal crime.

Simply stating that section 1962(d) does not mandate a new concept of conspiracy does not resolve the question of which of the two alternatives best comports with traditional conspiracy law and the purpose of RICO. The argument for the superiority of the *Carter* approach is best presented in the negative. Section 1962(d) explicitly prohibits conspiracies to violate RICO. The natural reading of that phrase is the proscription of any agreement the object of which is the conducting of or participation in the affairs of an enterprise through a pattern of racketeering activity. In other words, rather than creating a new law of conspiracy, RICO created a new objective for traditional conspiracy law—a violation of sections 1962(a), (b), or (c). *See United States v. Sutherland*, 656 F.2d 1181, 1192–93 (5th Cir.1981); *Elliott*, 571 F.2d at 902–03. Requiring an agreement personally to commit two predicate acts would establish a new form of conspiring in contradistinction to section 1962(d)'s base in traditional conspiracy law. Under the defendants' theory section 1962(d) would require not only an agreement to join in the conspiracy's objective, a RICO violation, but also an agreement to personally commit the underlying offense through the commission

of two predicate acts.[4] This involves a degree of involvement in the affairs of the conspiracy that is not required in any other type of conspiracy, where agreeing to a prescribed objective is sufficient.

Nothing on the face of the statute or its legislative history supports the imposition of a more stringent level of personal involvement in a conspiracy to violate RICO as opposed to a conspiracy to violate anything else. In fact, it seems more likely that Congress, in search of means to prosecute the leaders of organized crime, intended section 1962(d) to be broad enough to encompass those persons who, while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate crimes.

> The crime leaders are experienced, resourceful, and shrewd in evading and dissipating the effects of established procedures in law enforcement. Their operating methods, carefully and cleverly evolved during several decades of this century, generally are highly effective foils against diligent police efforts to obtain firm evidence that would lead to prosecution and conviction.
>
> The crime chieftains, for example, have developed the process of "insulation" to a remarkable degree. The efficient police forces in a particular area may well be aware that a crime leader has ordered a murder, or is an important trafficker in narcotics, or controls an illegal gambling network, or extorts usurious gains from "shylocking" ventures. Convicting him of crimes, however, is usually extremely difficult and sometimes is impossible, simply because the top-ranking criminal has taken the utmost care to insulate himself from any apparent physical connection with the crime or with his having to commit it.

Permanent Subcommittee on Investigations of the Senate Committee on Government Operations, Organized Crime and Illicit Traffic in Narcotics, S.Rep. No. 72, 89th Cong., 1st Sess. 2 (1965). Thus, the interpretation of the conspiracy provision presents the recurring theme of RICO jurisprudence: to interpret the statute to its full breadth in order to encompass the congressional goal of convicting insulated ring leaders runs the risk of expanding the net so wide that unintended fringe actors are also brought within the purview of RICO. While the issue involved here offers a number of tough policy questions the decision in favor of broad construction has been made both in the Supreme Court and this circuit. *See Sedima, S.P.R.L. v. Imrex Co.*, — U.S. —, 105 S.Ct. 3275, 3286–89, 87 L.Ed.2d 346 (1985); *Turkette*, 452 U.S. at 586–87, 101 S.Ct. at 2530–31; *Haroco*, 747 F.2d at 390–91. We conclude, therefore, that a RICO conspiracy requires only an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. Under this approach it is only necessary that the defendant agree to the commission of the two predicate acts on behalf of the conspiracy.

This court is not unmindful that the use of RICO has eclipsed the narrow scope of its legislative history and that RICO's compound crime-within-a-crime nature does create important distinctions between RICO conspiracy and section 371 conspiracy. It is these distinctions that prevent courts from using the statute to criminalize mere association with an enterprise and to usurp the law of conspiracy. It is important to emphasize two aspects of the 1962(d) conspiracy that serve to limit the scope of the theory: (1) the nature of the agreement required and (2) the necessity of proving the existence of an enterprise.

First, as was discussed above, the defendant must manifest his agreement to the objective of a violation of RICO; he need not agree personally to violate the statute. The next step this court must take is to provide a limited explanation of

---

**4.** Since the predicate crimes would have to be linked to the enterprise to fall within the scope of the conspiracy's objective, requiring an agreement personally to commit those crimes would amount to a requirement of agreeing personally to commit a violation of a substantive RICO provision.

an agreement to violate RICO. From a conceptual standpoint a conspiracy to violate RICO can be analyzed as composed of two agreements (in reality they would be encompassed by the same manifestations of the defendant): an agreement to conduct or participate in the affairs of an enterprise and an agreement to the commission of at least two predicate acts. Thus, a defendant who did not agree to the commission of crimes constituting a pattern of racketeering activity is not in violation of section 1962(d), even though he is somehow affiliated with a RICO enterprise, and neither is the defendant who agrees to the commission of two criminal acts but does not consent to the involvement of an enterprise. *United States v. Riccobene*, 709 F.2d 214, 224 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *United States v. Sutherland*, 656 F.2d 1181, 1189–95 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). *See supra* note 3. *See also* U.S. Dept. of Justice, *Racketeer Influenced and Corrupt Organizations (RICO): A Manual for Federal Prosecutors* 70–71 (1985). If either aspect of the agreement is lacking then there is insufficient evidence that the defendant embraced the objective of the alleged conspiracy.[5] Thus, mere association with the enterprise would not constitute an actionable 1962(d) violation. In a RICO conspiracy, as in all conspiracies, agreement is essential.

■ The second distinctive aspect of a RICO conspiracy is the need to establish the existence of an enterprise. While it is clear from the Supreme Court's decision in *Turkette*, 452 U.S. at 587, 101 S.Ct. at 2530, and *Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296–301, 78 L.Ed.2d 17 (1983), that the term "enterprise" encompasses legitimate entities and *de facto* illegal enterprises, it is important to emphasize that the term enterprise is not synonymous with the term conspiracy. *See United States v. Manzella*, 782 F.2d 533, 538 (5th Cir.1986). Clearly, when the government alleges that the enterprise is a legitimate business the issue does not arise. However, when the prosecution is based on an illegitimate association in fact the proof must establish, and the jury should be instructed to find, that the enterprise does exist and that the enterprise, while it can have the same personal composition as the conspiracy, is a

---

**5.** The Eleventh Circuit in *Carter* stated in dicta that if an alleged RICO conspiracy lacks the element of agreement on the objective of a RICO violation then "there is no pattern of racketeering activity unless the defendant supplies the lack by personally agreeing to engage in a pattern of racketeering activity in furtherance of the conspiracy's single objective." 721 F.2d at 1530. While neither of the appeals before this court requires the resolution of this question, it is difficult to embrace the logic of the *Carter* approach on this point for two reasons. First, the fact that the goal of the conspiracy is the ultimate commission of one criminal act does not preclude that objective from constituting a RICO violation where two predicate acts are required or actually agreed to as part of the conspiracy. *See United States v. Starnes*, 644 F.2d 673 (7th Cir.1981), *cert. denied*, 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 101 (1982). For example if a conspiracy to commit one act of arson is to be composed of at least two criminal acts it would not seem to strengthen the case for application of section 1962(d) if the defendant personally agreed to commit two acts as opposed to agreeing that the acts will be committed by any of the co-conspirators on behalf of the conspiracy. In either situation the defend-

ant could be deemed, assuming the enterprise connection is established, to have embraced a RICO violation as the conspiratorial objective. Second, as discussed above in the text, consent to the commission of two criminal acts standing alone does not constitute a RICO conspiracy. The defendant must also agree to "conduct or participate in the affairs of the enterprise." Both these elements must be present and together they establish a conspiracy the objective of which is a violation of RICO. Thus, agreeing personally to commit two predicate acts cannot transform the nature of a conspiracy in the absence of an agreement encompassing a RICO violation.

It should be pointed out that the issues discussed here implicate matters of pleading as well as matters of proof. In crafting the indictment the government determines the scope of the RICO conspiracy by defining the enterprise, the predicate acts, and, by implication, the objective of the conspiracy. When the government attempts to link multiple defendants or multiple conspiracies through the device of section 1962(d) the indictment must allege and the prosecution must prove that the conspiratorial agreement had as its overall objective the violation of RICO. *See supra* note 3.

distinct entity. While the hallmark of conspiracy is agreement, the central element of an enterprise is structure. An enterprise must be more than a group of people who get together to commit a "pattern of racketeering activity."

> We hold that Congress intended the phrase "a group of individual's associated in fact although not a legal entity," as used in its definition of the term "enterprise" in section 1961(4), to encompass only an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined a part from the commission of the predicate acts constituting the "pattern of racketeering activity."

*United States v. Anderson*, 626 F.2d 1358, 1372 (8th Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). *See also Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528; *United States v. Bascaro*, 742 F.2d 1335, 1362 (11th Cir.1984); *United States v. Phillips*, 664 F.2d 971, 1011 (5th Cir.1981); *Instituto Nacional de Comercializacion Agricola v. Continental Illinois National Bank*, 576 F.Supp. 991, 999 (N.D.Ill.1983). *Cf. United States v. Weinstein*, 762 F.2d 1522, 1537 (11th Cir.1985).

■ The central role of the concept of enterprise under RICO cannot be overstated. It is precisely the criminal infiltration and manipulation of organizational structures that created the problems which led to the passage of RICO. *See generally* McClellan, *The Organized Crime Act (S.30) or Its Critics: Which Threatens Civil Liberties?*, 46 Notre Dame Law. 1, 55 (1970). Thus, unlike the "standard" section 371 conspiracy, a RICO conspiracy involves two conglomerations of people, the conspiracy and the enterprise, and this distinction helps to insure that section 1962(d) is more limited than section 371. The government must establish the conspiracy and the enterprise and, in those cases where the enterprise is alleged to be an illegal association-in-fact, proof of one is not sufficient to

allow an inference of the existence of the other.

### III.

Beyond their respective claims concerning the appropriate standard, the defendants claim that the district court failed to instruct the jury adequately under either of the judicial positions on the need for personal commission, that there was inadequate evidence of agreement, and that the government attempted to exceed the scope of the indictment in search of predicate acts. We find nothing in these claims that requires reversal of the convictions.

*United States v. Neapolitan*

Neapolitan presents only one alleged error for review before this court. The RICO conspiracy count in the indictment was predicated on enumerated acts of bribery but only one of which is directly connected to Neapolitan. Thus, Neapolitan claims that the government cannot establish that he agreed to the commission of two acts of bribery and that in an effort to correct this deficiency the government attempted to exceed the scope of the indictment in order to establish the requisite involvement of the defendant.

■ The government does not deny that evidence of alleged criminal activity that was not specified in the indictment was introduced at trial. In fact, the government's brief on appeal continues to rely on this evidence in order to establish Neapolitan's involvement in the RICO conspiracy. This evidence not only improperly exceeds the scope of the indictment but also, and more importantly for purposes of this appeal, is largely irrelevant to the establishment of the RICO conspiracy *alleged by the government in this case*. Inherent in the above statement are two points unique to RICO which need further explanation.

■ First, it is well-established that the government cannot attempt to prove crimes at trial that were not identified in the indictment.[6] The defendant is entitled

---

6. This statement is subject to the qualification

that certain lesser included offenses, such as

to an indictment that states all of the elements of the offense charged, informs him of the nature of the charge so that a defense can be prepared, and enables the defendant to evaluate any possible double jeopardy problems presented by the charge. *United States v. Gironda*, 758 F.2d 1201, 1209 (7th Cir.1985). *See United States v. Miller*, — U.S. —, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985); *United States v. Mosley*, 786 F.2d 1330, 1333–34 (7th Cir.1986). The government contends that the unspecified predicate crimes are not charged offenses but are more analogous to evidentiary support which need not be in the indictment and can be obtained through a bill of particulars. Thus, it would be sufficient, according to this argument, for the indictment to state that the defendant engaged in various acts of bribery. This argument misconceives the nature of any RICO offense. Under the statutory scheme the predicate acts are not only important "elements of the crime" but they are also, by definition, distinct offenses. Because RICO provides increased penalties for the commission of these predicate crimes in a specified context, *see supra* part II, the failure to specify the underlying criminal activity in the indictment can effectively preclude the exact identification of what is being charged. RICO cannot be viewed as a complete offense distinct from the underlying crimes upon which it is based. *See generally United States v. Martino*, 648 F.2d 367, 396 (5th Cir.1981) ("Absent *a charge* and proof of an agreement to commit two of the *specified* predicate crimes, a defendant cannot be convicted of conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity.") (emphasis added).

Second, and as a corollary to the first point, it must be stressed that the government, through its ability to craft indictments, is the master of the scope of the charged RICO conspiracy. A section

1962(d) conspiracy is not a new generic category of conspiracy but a specific goal of traditional conspiracy law. This section of RICO is capable of providing for the linkage in one proceeding of a number of otherwise distinct crimes and/or conspiracies through the concept of enterprise conspiracy. The government, through the vehicle of the indictment, provides the linking conspiratorial objective of a *specific* RICO violation. *United States v. Sutherland*, 656 F.2d 1181, 1191–93 (5th Cir.1981). The "specific" violation can be broad or narrow depending on the number of predicate crimes within the scope of the agreement that the government chooses to identify. It is the prosecution which sets the parameters to which a RICO conspiracy trial must be confined; having set the stage, the government must be satisfied with the limits of its own creation. Thus, crimes allegedly committed by or agreed to by Neapolitan that do not appear in the indictment cannot serve as predicate acts for purposes of RICO. While these acts would be admissible as circumstantial evidence that Neapolitan was a member of a conspiracy, they are actions outside the scope of the specific RICO conspiracy charged in this case and are, thus, irrelevant to establishing that Neapolitan agreed to the commission of a pattern of racketeering activity *as defined by the present indictment.*

None of the deficiencies discussed above, however, calls for a change in the result of this trial. If one excludes the evidence of unindicted crimes there is still substantial evidence upon which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A RICO conspiracy, like all conspiracies, does not require direct evidence of agreement; an agreement can be inferred from the circumstances. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942); *United States v. Perci-*

attempt or aiding and abetting, need not appear in the indictment. *See United States v. Galiffa,*

734 F.2d 306, 315 n. 11 (7th Cir.1984).

*val,* 756 F.2d 600, 607 (7th Cir.1985); *United States v. Shelton,* 669 F.2d 446, 451 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982).

There is substantial circumstantial evidence that taken as a whole supports an inference that Neapolitan agreed to conduct the affairs of the sheriff's office through a pattern of racketeering activity and, more specifically, that he agreed to the commission of at least two of the predicate crimes listed in the indictment. First, statements were made by his alleged co-conspirators, Officers Sapit and Cadieux, to a government informant that identified Neapolitan as having been involved with the corruption in the sheriff's office arising out of the auto theft operation. Second, at the time Neapolitan received the bribe specified in the indictment, he made numerous statements, all of which were recorded, indicating that he was associated with others rather than working on his own. Third, while Neapolitan was taking his bribe, Officer Cadieux was also present to receive a payoff. There was also testimony to the effect that Cadieux arranged the meeting. This provides further evidence that Neapolitan was associated with Sapit and Cadieux and was aware of their activities. Fourth, the evidence of other crimes, while irrelevant for purposes of establishing predicate acts, is evidence of Neapolitan's link to the other officers because all these alleged crimes involved all three officers. At a minimum, this evidence establishes that Cadieux's presence at Neapolitan's bribe was not coincidence but part of an on-going relationship. Finally, it should be noted that even if one were to assume that the bribe to Neapolitan marked the commencement of his involvement, the indictment lists two other bribes, including the concurrent bribe to Cadieux, that would have occurred during Neapolitan's participation. On this record, there is sufficient evidence for a rational jury to infer that Neapolitan agreed to the commission of two of the predicate crimes that appeared in the indictment. The introduction of any non-indicted crimes for purposes of establishing a pattern of racketeering cannot, under the circumstances of this case, be deemed prejudicial.

### United States v. Covello

There is considerable overlap among the claims of the six defendants in the Covello trial. For purposes of this opinion these claims can be divided into four general categories. First, it is argued that the counts dealing with interstate transportation of stolen goods and consequently the RICO conspiracy based on these crimes fail for lack of proof that the particular items named in the indictment were stolen. Second, although the defendants' primary argument, that section 1962(d) requires an agreement personally to commit two acts, was disposed of in part II, they have argued in the alternative that the jury instructions failed to comply with the less stringent *Carter* standard. Third, at least some of the defendants insist that there was insufficient evidence to establish any agreement on their part to the commission of the specific predicate acts. As support for this argument they cite the failure of the jury to convict them of the substantive counts despite the giving of a *Pinkerton* instruction. Finally, a number of the defendants object to the admission into evidence of similar criminal acts in alleged violation of Rule 404(b) of the Federal Rules of Evidence.

### A. The Interstate Transportation of Stolen Goods

■ The indictment listed seven specific incidents of the interstate transportation of stolen car parts. These counts were incorporated into the RICO conspiracy count as the predicate acts forming the pattern of racketeering activity. The government does not claim to have direct evidence that the particular parts at issue are traceable to specific automobiles that can be identified. It is not necessary, however, that the government present direct evidence of theft. Theft can be established through circumstantial evidence. *See United States v. Drebin,* 557 F.2d 1316, 1328 (9th Cir.1977); *United States v. DeKunchak,* 467 F.2d 432, 435–36 (2d Cir.1972).

The evidence relied upon by the government, obtained through extensive surveillance, indicated that the ring leaders, defendants Mascio and Covello, presided over a large car theft operation that started with the "ordering" of specified automobiles, the processing of the auto parts, including obliteration of all vehicle identification numbers, and the eventual wholesaling out of the parts to salvage yards in Indiana and Iowa; that ninety to ninety-five percent of the parts handled by Mascio's and Covello's salvage yards were stolen; that the recipient of the parts, Piper Motor of Bloomfield, Iowa, paid for them by checks issued to fictitious payees and kept falsified invoices reflecting its receipt of the parts; and that Mascio and Covello received these checks and successfully cashed them at cooperative currency exchanges. Given the exceedingly narrow role of an appellate court in reviewing the decisions of the jury, see *United States v. Wiehoff,* 748 F.2d 1158, 1160–61 (7th Cir. 1984), it cannot be said that there is not sufficient circumstantial evidence from which a jury could rationally infer that the parts specified in Counts Two through Eight of the indictment were in fact stolen. The convictions of Covello, Mascio, Meadows, and Turner for interstate transportation of stolen goods, 18 U.S.C. § 2314 must be affirmed.

### B. *The Jury Instructions*

The Covello defendants also argue that the district court instructions to the jury failed to comport not only with the defendants' version of RICO conspiracy but also with the less stringent approach adopted by *Carter* and now by this court. Specifically, they claim that the charge fails to require the jury to find that any defendant agreed to the commission of two predicate acts—thus allowing the jury to convict for mere association with the enterprise. The portion of the instruction at issue provides:

> In order to establish the offense of conspiracy as alleged in Count 1, the government must prove these elements beyond a reasonable doubt.

> One, that the alleged conspiracy existed and, two, that the particular defendant under consideration knowingly and intentionally became a member of the conspiracy.

> A conspiracy is a combination of two or more persons to accomplish an unlawful purpose. A conspiracy may be established even if its purpose was not accomplished.

> • • • • •

> The agreement may be inferred from all of the circumstances and the conduct of all of the alleged participants.

> In determining whether a particular defendant became a member of the conspiracy, you may consider only the acts and statements of that particular defendant.

> • • • • •

> The government must prove beyond a reasonable doubt from the defendant's own acts and statements that he was aware of the common purpose and was a willing participant.

> In proving the conspiracy charged in Count 1, the government does not have to establish that each defendant explicitly agreed with every other conspirator to commit the substantive crime described in the indictment, or knew his fellow conspirators, or was aware of all of the details of the conspiracy.

> That each conspirator may have contemplated participating in different and unrelated crimes is irrelevant.

> *There is no requirement that each defendant must have agreed to commit two predicate acts of racketeering activity.*

> *The government need only prove that each defendant conspired to commit the offense of conducting the affairs of an enterprise through a pattern of racketeering activity* and was aware that others had done likewise.

> • • • • •

> What the evidence in the case must establish beyond a reasonable doubt is that the alleged conspiracy was knowing-

ly born *and that one or more of the means or methods described in the indictment were agreed upon to be used in an effort to effect or accomplish some object or purpose of the conspiracy as charged in the indictment,* and that two or more persons, including the defendant, were knowingly members of the conspiracy as charged in the indictment. (emphasis added).

Earlier the court had defined racketeering activity as follows:

The term racketeering activity for the purpose of this case includes any act in violation of Title 18, United States Code, Section 2314, such as charged in Counts 2 through 8 of the indictment.

■ The jury instructions in this case, while vague, are sufficiently in line with the approach adopted in this opinion to warrant their approval. The district court faced the unenviable task of attempting to define, in clear language, the elements of a RICO conspiracy in a context where appellate courts have given contradictory guidance. Clearly the jury was required to find an agreement. What that agreement had to encompass is less obvious. The charge accurately defines the basic crime—conspiracy to "commit the offense of conducting or participating in the affairs of an enterprise through a pattern of racketeering"—and also correctly states that each defendant need not agree to *commit* the predicate acts. It would have been preferable if the court had specifically required the jury to find that each defendant agreed to the commission of at least two of the predicate acts listed in the indictment. This element of the offense, however, was implicitly included in the charge through the court's definition of pattern of racketeering activity, which was described as part of the object of the conspiracy.

■ It is true that the district court in addressing the jury did make one serious error. In describing "a pattern of racketeering activity" the court erroneously treated the predicate crimes as examples of what could form the pattern by stating that "*any* act in violation of [18 U.S.C. § 2314], *such* as charged in Counts 2 through 8 of the indictment" could serve as a predicate act. This invites the jury to do what the government attempted in *Neapolitan,* that is to exceed the scope of the indicted conspiracy in search of other crimes to serve as predicate acts.

The transcript reveals that this error was in all probability unintended since the government's proposed instruction, from which this was adopted, and the copy of the instructions provided to the jury for use during deliberations do not contain the word "such" but accurately state the law as "racketeering activity ... includes any act ... as charged in ... the indictment." The record indicates that the defendants did not specifically object, as required by Fed.R.Crim.P. 30, to this instruction prior to its use, assuming they had a chance, or following the giving of the charge. Thus, this mistake requires reversal only if it constitutes "plain error." *United States v. Jackson,* 569 F.2d 1003, 1009 (7th Cir.1978). Under the circumstances of this case where the jury had the proper instruction before it during its lengthy deliberations and the court's detailed instructions nowhere else invite the jury to exceed the reach of the indictment, it cannot be found that "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *Jackson,* 569 F.2d at 1010. *See also United States v. Markowski,* 772 F.2d 358, 363 (7th Cir.1985).

C. *The Sufficiency of the Evidence*

■ There are two claims made by the defendants which can be grouped together under the general heading of the sufficiency of the evidence. First, defendants Hlavach, Messino, and Turner argue that the insufficiency of the evidence of their agreement to join the RICO conspiracy *set forth in the indictment* is established by the failure of the jury to convict them of two of the predicate acts of interstate transportation of stolen property despite a *Pinkerton* instruction.[7] Thus, according to these de-

7. While there is nothing in RICO precluding the use of *Pinkerton* instructions, the value of such

fendants, the jury must have found these acts to be outside the scope of their conspiratorial agreement, a conclusion which cannot be reconciled with a conviction under section 1962(d) predicated on the same acts. This argument is spurious and the jury's conclusions with regard to the substantive crime are irrelevant to the evaluation of the adequacy of the proof underlying the RICO convictions. In *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 473, 83 L.Ed.2d 461 (1984), the Supreme Court held that "a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count." *See also United States v. Witvoet*, 767 F.2d 338, 339 (7th Cir.1985). The Court in *Powell* found this rule to be applicable to situations "where the jury acquits a defendant of a predicate felony, but convicts on the compound felony." 105 S.Ct. at 478. *See also United States v. Brooklier*, 685 F.2d 1208, 1220 (9th Cir.1982), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983).

Thus, the sufficiency of the RICO convictions must be evaluated without regard for any inconsistency in the verdicts. Moreover, the argument for inconsistent verdicts is particularly weak in the present case where the *Pinkerton* instruction provided that the jury "may" find the defendants guilty of the substantive offenses if the requirements of *Pinkerton* are met. Following this instruction the district judge discussed at great length the personal nature of guilt. This discussion further undercut a *Pinkerton* instruction which already appeared to give the jury discretion as to whether to invoke the doctrine.

The second sufficiency argument, which is pressed by defendants Meadows, Hlavach, and Messino, is that the evidence adduced at trial did not adequately link them to the enterprise conspiracy alleged in the indictment. Unlike Covello and Mascio, these three defendants claim to be on the periphery of the conspiracy: Meadows was a frequent deliverer of parts; Messino allegedly acted as a type of recruiter of car thieves for the auto yards and a supplier of stolen autos; and Hlavach was one of a large number of car thieves who at various times worked for the enterprise.

There is no need to detail the evidence against Meadows or Messino. There is adequate evidence in the record upon which the jury could infer that both were members of the RICO conspiracy and "agreed" to the commission of at least two of the predicate acts. The case against Hlavach is less clear. There is no question that the government established a strong link between the RICO enterprise and Hlavach after November 30, 1981, the date, based on taped phone conversations, when Hlavach commenced actively stealing cars for M & J Auto Wreckers. According to the indictment, only one of the RICO predicate acts occurred after this date. The government responded to this by arguing that the indictment alleges an ongoing conspiracy that did not end until December 31, 1981 and that once found to be a member of a conspiracy the conspirator is liable for actions that occurred prior to his involvement. *See United States v. Lynch*, 699 F.2d 839, 842 n. 2 (7th Cir.1982). Both of these points are irrelevant to this case. First, as discussed with respect to Neapolitan, the scope of a RICO conspiracy is

---

instructions in the RICO context is questionable. Unlike a "standard" conspiracy, a section 1962(d) conspiracy provides for enhanced penalties based, at least in part, on involvement in the predicate crimes defining the conspiracy. Thus, a RICO conspiracy is, in and of itself, a cumulative punishment device, allowing for penalties a quantum harsher than those for other conspiracies. Given that implicit within the compound nature of RICO is a concept of punishment for substantive offenses, the commission of which was agreed to by the defendant, it

is difficult to see why the government needs to invoke a second cumulative punishment device in the form of *Pinkerton*. This is not to say that the use of *Pinkerton* instructions in RICO conspiracy cases is "wrong or improper" but only to caution that restraint be applied with regard to *Pinkerton* in this context. *See* Department of Justice, *RICO: A Manual for Federal Prosecutors, supra*, at 73–74 ("the combination of RICO and *Pinkerton* could lead to unwarranted extensions of criminal liability").

determined by the predicate acts, the last of which alleged in this case occurred December 31, 1981. In establishing the scope of the conspiracy the indictment listed a plethora of acts in furtherance of the conspiracy. Nothing prevented the government from classifying all of these acts as composing the pattern of racketeering activity and thereby eliminating almost all of the defendants' objections on appeal. The government elected to limit the predicate acts to seven and Hlavach, like all the defendants, can only be found guilty of the *indicted* conspiracy within these boundaries. Second, the government's reliance on *Lynch* is misplaced because retroactive liability is premised on finding that the defendant is a conspirator. However, before liability is extended back in time the government must prove Hlavach was a conspirator which, under RICO, requires proof that he agreed to the commission of the very acts for which retroactive liability is sought. The government cannot use this concept of co-conspirator liability to establish the existence of the conspiracy.

▄▄▄▄▄ Thus the issue for review is narrower than portrayed by the government: does the evidence support a jury finding that Hlavach agreed to join the conspiracy prior to November 30, 1981? Hlavach, as does defendant Messino, argues that there is no direct evidence of agreement on their part with regard to the predicate acts. While this is true it ignores that guilt in conspiracy cases can, and often is, based on inferences drawn from circumstantial evidence. In this case there was adequate circumstantial evidence from which the jury could find that Hlavach conspired to violate RICO. First, in a taped phone conversation on November 30, 1981 with the late Michael Chorak, a principal conspirator affiliated with M & J Auto Wreckers, Hlavach acknowledged that he had stolen cars for M & J in the past. Second, testimony at trial by a paid government informant who had done work for the auto ring linked Hlavach to the theft of two cars for M & J prior to November 30, 1981. Third, Hlavach's dealings with regard to automobiles stolen after November

30, 1981 and the taped conversations reveal a familiarity with the alleged enterprise's mode of operation. Finally, the evidence indicated that Hlavach was stealing cars on a regular basis for Messino during 1980 and 1981, a period during which Messino was supposedly a crucial part of the enterprise as both a recruiter of thieves and a supplier of stolen vehicles. Taking the evidence as a whole it cannot be said that a rational jury could not infer that Hlavach "agreed" to join the RICO conspiracy and, more specifically, to the commission of the predicate acts.

### D. *The Introduction of Similar Act Evidence*

▄▄▄▄▄ Hlavach, Covello, and Mascio all protest the introduction of evidence of similar acts which are alleged to be outside the scope of the conspiracy and thus inadmissible character evidence under Rule 404(b) of the Federal Rules of Evidence. This claim is completely without merit. Despite Hlavach's attempt to construe this evidence as "character evidence" the record illustrates that the purpose of this material, which relates primarily to Hlavach's past dealings with car thieves affiliated with the enterprise (Covello and Mascio just assert that FRE 404(b) was violated without specifying how), served as circumstantial evidence of Hlavach's connection to the auto theft ring. As was discussed with regard to Neapolitan, evidence of unindicted crimes, while irrelevant as predicate acts used to establish a RICO violation, can serve as circumstantial evidence of the defendant's connection to the enterprise and/or the conspiracy.

### IV.

For the foregoing reasons the convictions in both appeals are AFFIRMED.