**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Bradley S. ASHMAN, John Ryan, Joel J. Fetchenhier, Thomas P. Kenney, William A. Barcal, III, Sheldon Schneider, Edward A. Cox, III, John A. Vercillo, Martin J. Dempsey, and Charles Bergstrom, Defendants–Appellants.**

Nos. 91–2390, 91–2406, 91–2462, 91–2488, 91–2524, 91–2590, 91–2676, 91–2677, 91–2708 and 91–2709.

United States Court of Appeals, Seventh Circuit.

Argued June 11, 1992.

Decided Oct. 30, 1992.

Rehearing and Rehearing En Banc Denied Jan. 6, 1993.

See also 964 F.2d 596.

C. Steven Tomashefsky, Barry·A. Miller, Malcolm C. Rich, Chicago Council of Lawyers, Chicago, Ill., for amicus curiae Chicago Council of Lawyers.

James R. Epstein (argued), Jerry A. Esrig, Chicago, Ill., for defendant-appellant Martin J. Dempsey.

Michael D. Monico, Barry A. Spevack (argued), Monico, Pavich & Spevack, Chicago, Ill., for defendant-appellant John A. Vercillo.

Matthias A. Lydon, Jayne Carr Thompson (argued), Lydon & Griffin, Chicago, Ill., for defendant-appellant Edward A. Cox, III.

Matthew F. Kennelly, Margaret L. Paris, Robert M. Stephenson, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, Ill., for defendants-appellants Sheldon Schneider, Thomas P. Kenney and Joel J. Fetchenhier.

Nicholas F. Maniscalco, Chicago, Ill., for defendant-appellant William A. Barcal, III.

Gordon B. Nash, Jr., Gardner, Carton & Douglas, Matthew F. Kennelly, James R. Streicker, Cotsirilos, Stephenson, Tighe & Streicker, Patrick S. Coffey, Federal Public Defender, Office of Federal Public Defender, Chicago, Ill., for defendant-appellant John C. Ryan.

Nathan Z. Dershowitz, Amy Adelson, Dershowitz & Eiger, New York City, Alan M. Dershowitz (argued), Cambridge, Mass., for defendant-appellant Bradley S. Ashman.

Before BAUER, Chief Judge, CUDAHY and KANNE, Circuit Judges.

Joel D. Bertocchi, Asst. U.S. Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee U.S.

Nan R. Nolan, Robinson, Curley & Clayton, Donald C. Shine, Michael J. Daley, Nisen & Elliott, Chicago, Ill., for defendant-appellant Charles W. Bergstrom.

Garrett B. Johnson, Mark D. Young, Kirkland & Ellis, Scott E. Early, Chicago, Ill., Robert H. Bork (argued), Washington, D.C., Ann E. Barlow, New York City, for amicus curiae Bd. of Trade of City of Chicago.

BAUER, Chief Judge.

In this rather complex appeal, we review the claims of ten defendants, traders and brokers of soybean futures contracts at the Chicago Board of Trade ("CBOT"), who were convicted of various offenses including conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(c)), substantive RICO offenses (18 U.S.C. § 1962(d)), mail and wire fraud (18 U.S.C. §§ 1341 and 1343), and sundry infractions of the Commodity Exchange Act ("CEA") (7 U.S.C. §§ 6b, 6c, and 13c(a)). The final indictment

included 320 counts; the trial lasted almost three months, with an additional month of jury deliberations. All defendants were convicted of some charges; all save two were convicted of conspiring to violate RICO. On appeal, the defendants as a group raise fifteen separate claims of error in their consolidated brief. Moreover, each defendant raises individual claims, totalling 34 additional challenges to their convictions and sentences. For the most part, we are not persuaded by these claims. Nevertheless, on six counts, we determine that no fraud existed. On one additional count, we uncover a failure of proof. Thus, we affirm in part and reverse in part.

Due to the complexity of the issues involved in this appeal, some background information regarding the business of trading at the CBOT is necessary. The defendants consist of two types of floor traders: "locals," who trade on their own accounts, and brokers who execute orders from customers who may be CBOT members, but usually are members of the public trading through brokerage firms. The defendants, as well as numerous other traders, both indicted and unindicted, traded contracts for soybeans futures. A futures contract is an agreement between two parties to buy or sell a specified quantity of a given commodity—in this case soybeans—at a future date but with the price for the commodity established now. In the instant case, the jury found that these ten defendants fraudulently manipulated customer orders to buy and sell soybean futures.

Soybean trading, like the trading of other commodities, takes place in certain areas of the trading floor known as pits. Pits, as the name implies, are essentially round, tiered areas where traders and brokers in a given commodity face each other to trade contracts through open outcry. To the uninitiated, this system may appear to be nothing more than a collection of people in brightly colored jackets shouting and waving at one another. Under federal laws and regulations, as well as CBOT rules, all trades must be conducted, and all customer orders executed, in the competitive marketplace of the pit by open outcry. This means that a trader seeking to buy or sell, for himself or a customer, must bid (i.e. ask to buy) or offer (i.e. propose to sell) audibly and openly so that all other traders in the pit may accept that bid or offer.

After a trade is executed, the parties to the trade record the relevant details on trading cards, or in the case of a broker trading for a customer, on order forms. If a broker cannot fill an order in the market, he may return it as "unable." The relevant elements of the trade include the identity of the opposing trader, the amount of the commodity traded, the time at which the trade took place, and the price. "Runners" return cards and orders throughout the day to clearing firms which handle the necessary accounting of the trade. The CBOT also receives a copy of the cards and orders to ensure that both sides of the trade match or "clear."

When the details of a trade do not match in the clearing process, an error or "out-trade" occurs. Most out-trades are the result of some misunderstanding between the two parties to the trade involving price, quantity, or the identity of the opposing trader. An out-trade that is left unresolved means that one trader is left with a position in the market—i.e. an unfilled order to buy or an unaccepted offer to sell. This unresolved position can result in a loss or a gain depending upon how the market moves before the mistake is corrected.

When an out-trade occurs, the traders involved attempt to determine who made the error. The trader responsible for the mistake must cover any loss that results. In this situation, the trader who made the mistake issues the other trader an "out-trade check" to cover all or part of the loss. If the traders are unable to determine who made the mistake, CBOT's custom suggests that the two traders involved split the resulting loss evenly. Where an out-trade involves the execution of a customer order, however, the customer bears no loss: the broker accepts any negative financial consequences and, if necessary, makes up the difference to the customer. But where the out-trade ends profitably for the customer, the customer keeps that windfall.

Those traders who act as brokers often act independently, filling orders for customers of several different firms and earning commissions for each contract they execute. CBOT rules provide for several types of customer orders. A "market order" directs the broker to execute as soon as possible at the best available price (i.e. highest-priced sell or lowest-priced buy) in the pit. A "market on close" (hereinafter "MOC") or "market on open" (hereinafter "MOO") order directs the broker to execute just before the close or after the opening of trading. These MOO and MOC orders request execution at a specific time, rather than at a specific price, but still require the broker to obtain the best available price. "Price orders," as you might guess, instruct the broker to buy or sell a commodity at a specific price. Nevertheless, price orders also require the broker to fill at a better price if possible. A "stop order" contains a specific price for a buy or a sell; once that price is bid or offered, then the stop order immediately converts to a market order to be filled at the best available price.

Shortly after the opening and then again following the close of trading, the CBOT posts the opening and closing ranges. These ranges consist of the highest and lowest prices actually traded in the market during the period just after the opening of trading and immediately before the close. Thus, these ranges reflect what already has occurred in the pit—they do not exist until competitive trading establishes the high and low prices for the relevant period.

At trial, the government presented hundreds of allegedly fraudulent trades executed by the various defendants. The core of the charged crimes involved brokers surreptitiously avoiding the competitive nature of the pit to arrange trades with locals at selected prices. These arranged trades, determined without the usual open outcry bid or offer in the market, guaranteed profits to the local. The local would then do one of three things (or some combination) with these profits: he might keep the profits as repayment for a loss assumed by the local from an out-trade with the broker; he might hold the profits from the arranged trade as a credit against future errors or out-trades; or he might pass the profits back to the broker who had arranged the trade in the first place (i.e. a kickback) or to another trader to whom the broker owed money from other out-trades. Locals who took losses and profits from brokers in this way were referred to in the pit as "bagmen." *See* Transcript of Proceedings at Trial ("Trans.") at 528–29, 2214, 4263–64.

The government charged that defendants Charles Bergstrom, Sheldon Schneider, John Ryan, John Vercillo, and Joel Fetchenhier, as well as FBI Special Agent Richard Ostrom who traded undercover in the soybean pit, were local traders who acted as "bagmen." *See* Trans. at 528–29. Defendants Martin Dempsey, Thomas Kenney, Edward A. Cox III, William Barcal, James Nowak, and John Eggum were brokers who manipulated customer orders to create guaranteed profits for the locals. Defendants Bradley Ashman and David Skrodzki functioned as brokers or locals at different times. Prior to trial, defendants Nowak, Eggum, and Skrodzki pleaded guilty and testified as government witnesses.

For their crimes, the ten defendants received a varying combination of prison terms, fines, restitution levies, and forfeitures. *See United States v. Dempsey*, 768 F.Supp. 1277 (N.D.Ill.1991) (outlining the sentencing of defendants). The prison terms ranged from thirty-seven months for Bergstrom and Dempsey to three years probation for Ryan which included two months home detention. The defendants appealed their convictions and sentences.

## A. Consolidated Claims

As a group, the defendants first challenge three basic elements of their convictions: (1) that their mail fraud and wire fraud convictions must be reversed because there was neither a deprivation of any property right nor any specific intent to defraud; (2) that the mailing and wiring of information (necessary to sustain mail and wire fraud convictions) were not in furtherance of the alleged scheme; and (3) that all RICO convictions should be overturned because that statute is unconstitutional as applied to these defendants, and because

the district court inadequately instructed the jury on one of RICO's critical elements. We will consider each in turn.

■ The defendants first contend that the mail and wire fraud convictions based on "matching trades" should be reversed because "matching" does not involve the deprivation of a property right. *See* Defendants' Consolidated Brief at 20. The mail and wire fraud statutes require that the scheme to defraud seek to obtain "money or property." 18 U.S.C. §§ 1341, 1343. In a "match" (the most recurrent type of fraud charged in the indictment), a broker traded buy and sell orders in equal quantity with a cooperating local. The two traders simply agreed on the price of the trade rather than bidding or offering the customer order in the open market and securing the best price available. The broker thereby filled the customers' orders by selection and not on the market.

The great majority of matched trades involved MOC orders in which the defendant brokers filled orders after legitimate trading had ended for the day by selecting prices within the just-posted closing range. *See* Trans. 541–44, 551–52. The outcome of these matched trades depended on the prices the broker selected: if the local bought from and sold to a broker at the same price, they matched "at a scratch." Trading at a scratch meant that the local would neither make nor lose money. The evidence demonstrated, however, that, far more commonly, matches between the defendants resulted in profits for the local. The broker sold a customer's sell order to the local at a lower price than the price at which he bought a different customer's buy order from the same local. The local thereby would buy low and sell high with the customer orders from the broker, guaranteeing that the local made money. *See id.* at 3993, 4082–84.

An example may help illustrate how matched trading operated. After Schneider, a local, agreed to take a loss from broker Eggum caused by Eggum's mistake

in recording a trade, Eggum repaid him by selling him 30,000 bushels of soybeans (known as a "30–lot") from customers' sell orders and then buying back an equal amount with buy orders from other customers. Prices were selected from the closing range without bidding or offering in the market so that Schneider was able to sell the soybeans for a higher price than he paid and thus garnered a sure $300 profit. *See id.* at 3332–41. The record is replete with similar instances of matching.

Citing *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the defendants claim that matching trades does not violate the mail fraud statute because no one is deprived of money or property.[1] On the contrary, argue the defendants, when a customer's order was filled at a price within the relevant range, the customer received exactly what he asked for. *See* Defendants' Consolidated Brief at 23. While the defendants acknowledge that matched trades constitute violations of the required "open outcry" system, they contend that the trades do not amount to deprivations of money or property. *Id.*

We disagree. We do not dispute the defendants' assertion that *McNally* rejected the use of the mail fraud statute to criminalize schemes involving the deprivation of intangible rights. *See* Defendants' Consolidated Brief at 21. As the defendants accurately note, *McNally* made it clear that the mail and wire fraud statutes protect *property rights* only and "that a scheme to defraud must involve the deprivation of something of value by trick, deceit, chicanery or overreaching." *Id.* (quoting *McNally*, 483 U.S. at 358, 107 S.Ct. at 2880).

The instant convictions, however, are not inconsistent with this principle. By picking customer prices and opposing traders, the defendants removed their customers from the pit's competitive marketplace and forced the customers to accept the results they selected, guaranteeing profits to the local and denying the customer the oppor-

---

1. The fraud counts challenged by the defendants predate November 18, 1988, the effective date of 18 U.S.C. § 1346, which reinstated the "intangi-

ble rights" theory rejected in *McNally*. *See* Defendants' Consolidated Brief at 22.

tunity to obtain a better price. In previous cases, we have held that shifting or altering of economic risk or opportunity to affect a person's financial position adversely deprives that person of money or property. In *United States v. Dial*, 757 F.2d 163 (7th Cir.1985), we held that a futures broker personally trading ahead of his customers committed fraud "in a classic sense" by causing customers to lose additional profits they would have made except for the improper execution of their orders. 757 F.2d at 168–70:

> [I]t [is] fraud to fail to "level" with one to whom one owes fiduciary duties. The essence of a fiduciary relationship is that the fiduciary agrees to act as his principal's alter ego rather than to assume the standard arm's length stance of traders in a market. As a broker, and therefore ... a fiduciary of his customers, Dial, when he solicited his customers to participate in block orders, implicitly represented to them that he would try to get the best possible price. He could have gotten a better price by putting their orders in ahead of the orders he placed for his own accounts and those of his friends. In trading ahead of his customers without telling them what he was doing, he was misleading them for his own profit, and conduct of this type has long been considered fraudulent.

*Id.* at 168.

Similarly, in *Lombardo v. United States,* 865 F.2d 155 (7th Cir.), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989), the defendants were convicted of wire fraud based upon their attempt to control the sale of a parcel of Las Vegas property, called Wonderworld, owned by the Teamsters Central States Pension Fund. The *Lombardo* defendants claimed that *McNally* required reversal of their convictions because, if there was a scheme to defraud, the putative victims were defrauded only out of intangible rights, not tangible property. We disagreed:

> The evidence ... supports the conclusion that the defendants engaged in a scheme to obtain money or property by fraudulent means. The essence of the conduct in which the defendants engaged was the

attempted sale of the Wonderworld property ... for $1,400,000 in spite of existence of higher bids. Such a scheme clearly contemplated depriving the Pension Fund of the highest price for the Wonderworld property.

*Lombardo,* 865 F.2d at 159.

*Dial* and *Lombardo* demonstrate that the deliberate deprivation of a clear financial opportunity violate the mail fraud statute. The selection of prices without competition deprived customers in the instant case of a clear market opportunity to obtain the best price for their orders. It does not matter if the defendants' customers were not harmed financially because of the scheme. In *United States v. Cosentino,* 869 F.2d 301 (7th Cir.1989), for instance, we held that a scheme to misappropriate an insurance company's premiums and deprive the Illinois Department of Insurance of its right to be fully informed (which in turn denied policyholders the benefit of the insurance department's supervision) violated the mail fraud statute. As Judge Cudahy wrote for the court, "It is not necessary that a plan actually result in financial loss as long as it is aimed at the fraudulent deprivation of some of the victim's money or property." *Id.* at 307.

With this guidance, we have no difficulty concluding that the defendants' scheme to deprive CBOT customers of orders filled by the competitive market falls within the purview of the mail and wire fraud statutes. We reject the defendants' assertion that the instant scheme did not rob any customer of a tangible interest. Our case law makes clear that even though the customers may not be entitled to any specific price, deliberate refusal to pursue the best price the broker could obtain can constitute a scheme to defraud. *See also Ranke v. United States,* 873 F.2d 1033, 1038–39 (7th Cir.1989) ("[A] property deprivation might occur where, absent the scheme, the victim is 'deprived of control over how its money is spent,' ... [or] where, absent the scheme, the victim 'would have paid a lower price' for the

goods or services received." (quoting *McNally* )).

■ Our conclusion that matching constitutes fraud because customers are denied the opportunity to obtain a better price from the market implies that where customers have no opportunity to obtain a better price, matching does not violate the mail fraud statute. The defendants contend that in certain types of market situations—so-called "limit days"—when the price of a given commodity was fixed and no other price was being traded in the pit, fraud was impossible because there was no chance for the customer to obtain a better price. Limit days are the result of CBOT rules that attempt to curb dramatic and potentially dangerous swings in prices. The CBOT simply limits the amount that a commodity price may rise or fall on any given day. When the price of the commodity reaches its limit, the price is not allowed to continue climbing (or falling, as the case may be) during that trading session, and therefore, all trading is executed at the limit price. When the price of a commodity is limit-up (or limit-down), it is generally true that the commodity's price will rise again (or fall again) at the start of the next trading session. *See* Government's Brief at 9–10.

During the summer of 1988, when drought conditions led to several "limit-up" days in the soybean pit, the defendant brokers executed scarce orders (e.g. a sell order when the price was limit-up) with selected locals, again without offering those orders in the open market. The government charged some defendants with mail and wire fraud based on their arranged trades when the soybean market was set at a limit price. While the defendants concede that they failed to execute their limit-day trades by open outcry, they submit that, because there was no price competition in the market on those trades, they did not deprive the customers of any money or property. *See* Defendants' Consolidated Brief at 31–32. We agree. Merely denying a customer the opportunity to obtain the limit price by open outcry rather than by arranged trades strikes us as the kind of intangible deprivation that *McNally* held could not constitute mail or wire fraud. *See McNally*, 483 U.S. at 358, 107 S.Ct. at 2880 (declaring the mail fraud statute protects "property rights" only and that a scheme to defraud must involve the "deprivation of something of value by trick, deceit, chicanery or overreaching").

■ The government concedes that no customer lost money on the defendants' limit-day trading. Instead, the government argues that the defendants violated the mail and wire fraud statutes by depriving other traders in the pit—those that were not quietly selected by the defendant brokers—of money or property: "By keeping valuable orders to themselves, defendants deprived other traders and customers of other brokers the opportunities for profits from trading on them." Government's Brief at 33. We are not persuaded. As the defendants accurately point out, the government's argument boils down to an assertion that open outcry trading by itself constitutes a property right protected under the mail and wire fraud statutes. *See* Defendants' Consolidated Brief at 32. We hold that the failure to execute trades by open outcry does not constitute a deprivation of money or property under the fraud statutes. The customer would have received the same price—the limit price—whether or not the trade was offered openly in the pit. *See, e.g., Toulabi v. United States*, 875 F.2d 122 (7th Cir.1989) (an interest in seeing employees conform to the law does not constitute a property right); *Ward v. United States*, 845 F.2d 1459 (7th Cir.1988) (that a state might have lost fines an honest judge might have imposed had defendant not bribed judge was insufficient to establish a property right). Thus, the fraud counts based upon limit day trading must be reversed.

■ The defendants next argue that the jury's finding that they intended to defraud is unsupported. *See* Defendants' Consolidated Brief at 32. They suggest that they acted only in good faith without the requisite specific intent necessary to violate the mail fraud statute. The defendants argue:

[T]he totality of the evidence established that the brokers and traders in the soybean pit often engaged in 'matches' as an expedient way of filling orders that, in a hectic market, would otherwise be left unfilled, and that they firmly believed that customers who had orders filled within the opening or closing range, even if the prices were determined by arrangement, benefitted from the trades.

Defendants' Consolidated Brief at 34. This good faith, the defendants conclude, is a complete defense to the charge of mail fraud. *See United States v. Martin–Trigona,* 684 F.2d 485, 492 (7th Cir.1982).

We do not dispute that good faith is a complete defense to mail fraud; we simply question whether the evidence supporting the defendants' intent to deprive customers of money or property is as thin as defendants claim. In order to convict defendants of mail fraud, the jury had to find that they had a specific intent to defraud. *United States v. Johnson,* 927 F.2d 999, 1003 (7th Cir.1991). On appeal, we are obliged to view the evidence, and all reasonable inferences from it, in the light most favorable to the government and may overturn the finding of intent "only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Wiehoff,* 748 F.2d 1158, 1160–61 (7th Cir.1984). *See also United States v. Biesiadecki,* 933 F.2d 539, 545 (7th Cir.1991). We may, of course, consider both direct and circumstantial evidence. *Cosentino,* 869 F.2d at 308.

The ample evidence in this case refutes the defendants' claim that they lacked the specific intent to commit mail and wire fraud. Defendants emphasize that on cross-examination, Eggum, Nowak and Skrodzki, who pleaded guilty, testified that at the time they traded, they did not intend to cheat or defraud anyone. We have two responses to this claim: first, the jury did not have to believe this testimony; and second, while the defendants may not have had the terms "cheat" or "defraud" precisely in mind as they arranged trades, that intent may be inferred "when the scheme has such effect as a necessary result of

carrying it out." *United States v. London,* 753 F.2d 202, 206 (2d Cir.1985). As we shall see, there was indeed sufficient evidence from which the jury could infer that the defendants intended the necessary result of their actions.

Perhaps the most compelling proof of the defendants' desire to make profits at the customers' expense lies in the fact that the matched trades which formed the basis of the fraud counts were arranged so as to generate profits to the traders. As we explained at the outset of this opinion, these profits were used to cover personal losses from the traders' own errors. Each matched trade could have been executed at a scratch—that is, by picking the same price for buying and selling customers. *See* Trans. at 541–42. But matches at a scratch generated no profits to the defendants. Instead, the defendants matched their trades with the buy orders lower and the sell orders higher—permitting the traders to make profits at the customers' expense. *See* Trans. at 541–44, 3993, 4082–84.

The record is replete with examples: after Schneider agreed to take a loss from broker Eggum caused by Eggum's mistake in recording a trade, Eggum repaid him by selling him a total 30–lot (i.e. 30,000 bushels) on customer orders and buying back an equal amount on orders from other customers. Eggum and Schneider picked prices without bidding or offering in the market, which permitted Schneider to sell for more than he paid, guaranteeing Schneider a $300 profit. *See id.* at 3332–41. Broker Dempsey dictated to Agent Ostrom a series of customer buys and equal quantity of sells, all at prices selected by Dempsey to give the selling customers lower prices than buying customers, generating a $1,600 profit to Ostrom. This was Dempsey's first step in repaying the undercover agent for accepting a $34,000 loss caused by Dempsey's mishandling of a customer order. *See id.* at 1448–53, 1460–67, 2954–57.

Similarly, brokers Kenney and Eggum matched customer orders to buy and sell a

65–lot on each side. Ashman acted as the local trader; Kenney dictated the buys from Ashman first, and then told Eggum to execute the sell orders with Ashman, which Eggum did at lower prices that bestowed a $650 profit on Ashman. *See id.* at 3156–66. Nowak arranged a sale on an order of a 100–lot to Ostrom at a picked price and told Ostrom to "work it out" with Bergstrom, from whom Nowak already had bought a 100–lot at a higher price. After Nowak's sale, Bergstrom and Ostrom arranged a trade together at a price in the middle of Nowak's buy and sell prices and then split the profits, about $500 apiece. *See id.* at 1429–34. Broker Cox used the same procedure on closing orders with defendant Skrodzki and trader Jim O'Brien, who traded together to split $1,600 profit. *See id.* at 4945–47. Fetchenhier too deliberately participated in the scheme. Nowak testified that he selected certain prices that generated profits for Fetchenhier because Nowak owed him for accepting losses. *See e.g. id.* at 4126–38. These few examples demonstrate that the jury had ample basis to conclude that the defendants manipulated orders with the intent to deprive customers of better prices so that they could generate profits for themselves. Viewing the evidence in the light most favorable to the government, we reject the defendants' claim that the evidence was insufficient to support the jury's finding that they intended to defraud.

In their second set of consolidated claims, the defendants argue that their mail and wire fraud convictions must be reversed because the requisite mailing and wiring was not in furtherance of the scheme to defraud. For these claims, the defendants largely adopt the arguments of the amicus curiae, the CBOT. Specifically, the CBOT claims that the jury could not rationally have found that the mailing and wiring of statements confirming the execution of trades to customers furthered the defendants' scheme to defraud. We disagree. The evidence establishes that, through mailing and wiring, the defendants advised customers of the results of their orders, helping to conceal the fraudulent trading and thereby furthering the scheme.

Again we note that when reviewing the sufficiency of the evidence that the mailing and wiring furthered the scheme, we consider the record in the light most favorable to the government and uphold the jury's decision if any rational trier of fact could have so found beyond a reasonable doubt. *Biesiadecki,* 933 F.2d at 545 (citations omitted).

The mailings and wires in this case comprised various transmissions by clearing firms to customers confirming the execution of orders, including the date of execution, the quantity traded, and the price obtained. CBOT rules require these confirmations. *See* CBOT Regulation 421.00. Although these statements directly communicated the results of the defendants' transactions (but, of course, not *how* the trades were conducted), the CBOT contends that the transmissions did not further the scheme because (1) the mailings occurred after the alleged fraud had been completed; (2) they were not material to the fraud; (3) the mailings were required by law; and (4) the information provided by the mailings was entirely accurate. *See* CBOT Brief at 5.

The CBOT relies on three cases, *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), and *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), to suggest that the mailings in the instant case are insufficient to sustain mail fraud convictions. The defendants in *Kann* were corporate officers and directors accused of setting up a dummy corporation through which they diverted profits into their own pockets. As part of their scheme, the defendants caused the corporation to issue two checks payable to them. The defendants cashed these checks at local banks, which then mailed the checks to the drawee banks for collection. The Supreme Court held that mailing cashed checks to the drawee banks could not supply the mailing element of the mail fraud charges. *Kann,* 323 U.S. at 94, 65 S.Ct. at 150. The Court reasoned that the defendants' fraudulent scheme already had

reached fruition. "It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Id.*

In *Parr*, several defendants were charged with fraudulently obtaining gasoline and other items through the unauthorized use of a credit card issued to the school district that employed them. The mailing element of the mail fraud charges occurred when the oil company that issued the credit card mailed invoices to the school district for payment, and when the district mailed payment in the form of a check. Relying on *Kann*, the Supreme Court held that the mailings were not in execution of the scheme as required in the mail fraud statute because it was immaterial to the defendants how the oil company collected its payment. *Parr*, 363 U.S. at 393, 80 S.Ct. at 1184.

Finally, in *Maze*, the defendant allegedly stole his roommate's credit card, headed south, and obtained food and lodging at motels along the route by placing the charges on the stolen card. The mailing element was supplied by the defendant's knowledge that each motel proprietor would mail an invoice to the bank that issued the credit card, which in turn would mail a bill to the card owner for payment. The Court determined that these mailings could not support the mail fraud charges because the defendant's scheme reached fruition when he checked out of each motel. As the Court observed, the success of his scheme in no way depended on the mailings; they merely determined which of his victims ultimately would bear the loss. *Maze*, 414 U.S. at 402, 94 S.Ct. at 649.

Yet, these cases are contrasted with the Court's more recent holding in *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Although *Schmuck* did not overrule *Kann, Parr,* and *Maze*, it emphasized that courts must consider the full scope of the scheme when determining the sufficiency of the mailing element. Put simply, *Schmuck* leads us to believe that the CBOT's contentions regarding the mailing of trading confirma-

tions must fail. In *Schmuck*, a used car dealer who sold cars with rolled-back odometers to retailers, was convicted of mail fraud based on the subsequent mailing of title applications by the retailers after they resold the cars. Affirming the conviction, the Court stated, "To be part of the execution of fraud, however, the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." *Id.* at 710–11, 109 S.Ct. at 1447. In determining that the mailings in *Schmuck* were indeed incident to an essential part of the scheme, the Court considered the scope of Schmuck's fraudulent scheme, noting that it was "not a one-shot operation in which he sold a single car to an isolated dealer." *Id.* at 711, 109 S.Ct. at 1447. Schmuck's scheme depended upon continued harmonious relations with his customers. *Id.* at 712, 109 S.Ct. at 1448.

Given these circumstances, the Court held that a rational jury could have found that the title-registration mailings were part of the executions of the scheme, "a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title." *Id. Schmuck* makes clear that the challenged mailings must be understood in the context of the full scheme to defraud. CBOT's claim, then, that the mailings did not further the scheme because the fraud was complete when the confirmations were mailed and because the information contained in the transmissions was accurate must be rejected. That the mailings were accurate—that is, that they listed the prices obtained for the customers—and that the fraud already was complete does not undermine our belief that the confirmations in the instant case furthered the scheme by lulling customers into believing that nothing was wrong with the execution of their orders. Indeed, in an important sense, the confirmations were far from accurate. They served as representations that the trades had been executed in the open market. As the district court appropriately observed, the confirmations "told the truth, but not the whole truth." *U.S. v. Dempsey*, 768

F.Supp. 1256, 1273 (N.D.Ill.1990). By reporting the results of their arranged trading, the defendants presented the information as if it was obtained by genuine entry into the market. The customers who testified at trial stated they expected their orders to be filled in the market at the best price available, and had no idea that the prices they received had been fraudulently selected for them by the traders. *See* Trans. at 4713–16, 4739–40, 5303–06, 5313, 5315.

Moreover, like the scheme in *Schmuck*—and unlike the schemes in *Kann, Parr,* and *Maze*—the fraudulent activities of the defendants in the instant case depended upon a smooth flow of executed orders from traders on the CBOT floor to the public customers. As the *Schmuck* court observed, the mailings in *Kann* and the credit card invoice mailings in *Parr* and *Maze* involved little more than post-fraud accounting. *Schmuck,* 489 U.S. at 714, 109 S.Ct. at 1449. But concealment—in this case, the appearance of legitimate trading—formed a vital part of the instant defendants' ongoing scheme. The mailing and wiring aided that concealment. They led customers to believe that the broker had attempted to obtain the best price available in the market; they prevented customers from complaining that they were not getting appropriate execution of their orders, and, perhaps most importantly, they maintained the defendants' positions of trust as brokers and traders on the CBOT. After all, a failure to mail or wire the trading information "would have jeopardized [the defendant's] relationship with [those] [i.e. in the instant case, clearing firms and customers] upon whose unwitting cooperation [their] scheme depended." *Id.* Thus, we have no doubt that the jury reasonably could have found that mailings and wires furthered the defendants' scheme to defraud. *See Biesiadecki,* 933 F.2d at 545 (mailing to customers of account statements furthered continuing scheme by forestalling customer withdrawal and action against the defendants). *See also United States v. Lane,* 474 U.S. 438, 452–53, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986) ("[T]he jury could reasonably have found that the scheme was not completed ... because that mailing was intended ... to lull the insurer into a false sense of security.").

■ Nor are we persuaded that, because the confirmations in this case were required by law, they did not further the scheme. Both the Supreme Court and this court have rejected the claim that *Parr* holds categorically that required mailings cannot further fraud. *Schmuck* noted that while the mailings in *Parr* were solely the product of a legal duty and would have been made regardless of the defendants' fraudulent scheme, the mailings in *Schmuck* derived from Schmuck's scheme to sell modified cars. The *Schmuck* mailings would not have occurred but for the scheme. 489 U.S. at 713–14 n. 7, 109 S.Ct. at 1448–49 n. 7. The same is true in the instant case: the confirmations were the direct result of fraudulent trading. Had the defendants not executed the arranged transactions, those specific trades would have not occurred, obviating the need for any confirmation. Absent the defendants' fraud, it is quite likely that the same transmissions would not have been sent. We hold, then, that the jury reasonably could have found that the mailing and wiring of trading information furthered the defendants' scheme to defraud.

■ The defendants raise an additional challenge to the mailing/wiring element: they claim that the wired confirmations to a particular customer, Broadcort Capital Corporation, did not further the fraudulent scheme. Broadcort Capital, a firm in New York, is a wholly-owned subsidiary of Merrill Lynch & Co. ("Merrill"). Merrill Lynch Futures, Inc., which has representatives on the CBOT floor, is another wholly-owned subsidiary of Merrill. The defendants claim that, because representatives of Merrill Lynch Futures were informed of the details of Broadcort trades right on the CBOT floor, the subsequent wire transmissions to Broadcort in New York were superfluous. The defendants argue, "[The wired transmissions to Broadcort were] nothing more than an internal Merrill Lynch communication for record generating purposes. Long before the wire was

made, Broadcort was informed of its fill." Defendants' Consolidated Brief at 37–38.

We are not persuaded. In *Lane*, the defendants obtained insurance on various buildings, torched them, and then collected the insurance proceeds. The mailing element was supplied by the forms the claims adjustor sent to his company's home office *after* the defendants had been paid. 474 U.S. at 452, 106 S.Ct. at 733. Citing *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), *Lane* specifically determined that the late nature of the mailings did not undermine the finding that they furthered the scheme to defraud: "[We conclude] that the delayed mailings at issue in this action were part of an ongoing scheme to defraud ... because of the lulling effect of the delayed mailings. Had the Lanes failed to submit timely proof-of-loss forms here, the insurer might very well have discovered the fraud." *Lane*, 474 U.S. at 452–53 n. 16, 106 S.Ct. at 733–34 n. 16.

■ In the instant case, we do not believe that awareness of the Broadcort trades by the representatives of Merrill Futures, Inc., Broadcort's "sister" company, *see* Defendants' Consolidated Brief at 37, renders the subsequent transmission of confirmations to Broadcort unrelated to the fraudulent scheme. If that were true, then the claims adjustor's knowledge of the Lanes' alleged loss would have rendered the later mailings in *Lane* insufficient to satisfy the requirements of the mail fraud statute. As *Lane* determines, delayed mailings still may advance the purposes of the fraudulent scheme. *Lane*, 474 U.S. at 453 n. 16, 106 S.Ct. at 734 n. 16. In the instant case, the transmissions to Broadcort furthered the scheme by depicting normalcy to, and forestalling complaints or

inquiries by, those in New York who placed the orders and who would decide whether to place additional orders. Thus, the jury could have found that the Broadcort transmission satisfied the wiring element of the wire fraud statute.

■ In their third set of consolidated claims, the defendants attack the application of RICO to their scheme to defraud CBOT customers.[2] The defendants challenge two fundamental elements of RICO's application in this case: that the government failed to prove a single conspiracy and that RICO, as applied here, is unconstitutionally vague.[3] The defendants first contend that the government, "if it proved anything at all, did not prove the common purpose of a single enterprise, but, at most, ... numerous separate adventures of like character." Defendants' Consolidated Brief at 42 (quotations omitted). We note that, even if the evidence arguably established multiple conspiracies, we will not disturb the jury's finding so long as a reasonable juror could have found the existence of the single conspiracy as charged in the indictment. *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991). Again, we view the evidence in the light most favorable to government, *see United States v. Mealy*, 851 F.2d 890, 895 (7th Cir.1988), and fully consider circumstantial evidence, which in fact may constitute the sole support for a single conspiracy finding. *United States v. Briscoe*, 896 F.2d 1476, 1505 (7th Cir.1990). *See also Townsend*, 924 F.2d at 1390.

■ The jury convicted eight of the defendants (i.e. Ryan was not charged with RICO conspiracy and Barcal was acquitted on that count) of "conspir[ing] and agree[ing] with each other ... to conduct

---

**2.** The relevant RICO statutes provide:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (c) of this section.

18 U.S.C. § 1962(c) and (d).

**3.** The defendants raised a third claim involving RICO: that their RICO conspiracy convictions must be reversed if we overturn their mail fraud convictions. *See* Defendants' Consolidated Brief at 39. Because we largely affirm the defendants' mail fraud convictions (the only exception is the set of convictions involving limit-up or limit-down trades), we deny this additional claim.

and participate in the conduct of the affairs of the CBOT, directly and indirectly, through a pattern of racketeering activity...." Count 1, Second Superseding Indictment at 3. The indictment alleged that that pattern consisted of multiple acts of mail and wire fraud. To prove a single conspiracy, the government need only have shown that any particular defendant agreed to conduct the affairs of the enterprise (i.e. the CBOT) through the commission of two predicate acts of mail or wire fraud. *See United States v. Neapolitan*, 791 F.2d 489, 495–96 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). *Neapolitan* explains that "agreeing to the commission of the conspiracy's illegitimate objectives constitutes the crime. The goal of a RICO conspiracy is a violation of RICO. The defendant need only agree to a single violation of RICO; he need not agree personally to violate the statute." *Id.* at 496. *See also United States v. Stern*, 858 F.2d 1241, 1246–47 (7th Cir.1988) ("The RICO conspiracy provision does not require that a defendant agree personally to commit two acts of racketeering activity.").

The evidence in this case demonstrates that the jury had sufficient reason to find the existence of a single conspiracy. Indeed, the ample evidence revealed a single agreement among defendants and others to operate a system of fraudulent trading that was designed to eliminate the risk of competition. As the government aptly notes, the defendants formed a kind of anti-market that operated in the same place as the legitimate market, but with very different rules. *See* Government's Brief at 55. The legitimate market fostered independence and competition; the defendants' anti-market relied on fraudulent interdependence and a resulting mutual benefit at the expense of customers—characteristics typical of a conspiracy.

Section 1962(d) (RICO conspiracy) was enacted "against the backdrop of hornbook conspiracy law." *Neapolitan*, 791 F.2d at 496 (quotations omitted). "Classic conspiracy law," then, may inform our analysis. *Id.* In *Townsend*, a drug conspiracy case, we emphasized that interdependence and

mutual benefit support the inference of common agreement. 924 F.2d at 1391–92. In this case, the record is rife with such examples. As the government asserted in both its brief and at oral argument, to respond effectively to the recurring problem of error losses, the defendants needed more than sporadic opportunities for profit; they needed a system. *See* Government's Brief at 56. That system required numerous participants because more members of the conspiracy permitted greater opportunity to correct errors. Consider these examples: defendant Cox and another trader, who did not often trade with Nowak, used the system to persuade Nowak to take the loss on an out-trade and repay him with customer order trades with Bergstrom, who simply passed the profits back to Nowak. *See* Trans. at 4044–4058. In addition, defendant Ashman, who had never before traded illegally with Agent Ostrom, could bluntly ask Ostrom if he could "put a little money into [him]," and use the matching procedure familiar to both. *See id.* 1478–80, 2875–79.

Defendant Kenney conducted most of his fraudulent trading with defendants Eggum, Schneider, and Barcal, but under the broader agreement could use Bergstrom and Ostrom to obtain orders for his own account, picking prices to secure guaranteed profits. *See id.* at 623–35, 2865–76. Eggum could pay off a debt to Bergstrom the same way he usually repaid Schneider, that is, by matching orders with Schneider and Bergstrom in the same transaction. *See id.* at 1258–60, 3175–86, 3239–42. Nowak and another broker orchestrated another series of trades to create profits in defendant Fetchenhier's account. *See id.* at 991–92, 1002–05, 4126, 38, 4484–90. Also, when defendant Skrodzki left his position as a broker (where he commonly matched his customers' orders with Nowak, Bergstrom, and Ryan), he crossed the pit and assumed the role of bagman for defendant Cox. These examples demonstrate the flexibility created by the overarching agreement.

But perhaps the best evidence of a single conspiracy involved the scratch traders—

those who acted solely to launder transactions by concealing the real parties to the fraudulent trade. As we have discussed, the scratch trader would buy from one party and sell to the other at the same price, thus "scratching" his trades with no profit or loss to himself. As the government asserts, scratch trades served to disguise the real nature of the arranged transaction. *See id.* at 495, 2964–68, 4004, 4644, 6267. *See also* Government Brief at 14. For example, Bergstrom passed $1,000 he held for Nowak from customer order trades to another trader of Nowak's choice, with Nowak serving as the scratch between Bergstrom and the other trader. *See id.* at 4100–02. Another time Dempsey directed Ostrom to pass $4,125, which Ostrom held for Dempsey as a result of profitable customer trades, to another trader whom Dempsey owed money from an earlier trade. Dempsey had Kenney act as the scratch trader between Ostrom and the trader to whom the money was passed. *See id.* at 842–44, 860–65, 2905–06.

Similarly, Nowak directed Ostrom to pass $4,000 that Ostrom was holding for him back to Nowak in two sets of prearranged trades. Nowak recruited Fetchenhier to trade between them so that it would not, in Nowak's words, "look terrible"—that is, "look like a prearranged trade." *See id.* at 1672–74, 4258–59. Another time Ostrom passed $1,000 of Dempsey's money to Bergstrom, with Nowak as the scratch trader between them. *See id.* at 937–40. In addition, defendant Cox, who regularly had Skrodzki pass back about half of the profits generated from their matching of customer orders, used several others as scratch traders between them. *See, e.g., id.* at 4839–44, 4850–54, 4847–49, 4854–4860, 4864–72.

These examples demonstrate that the defendants freely served as scratch traders for one another, often without any direct economic reward for themselves, and support the jury's finding of an overarching cooperative agreement among defendants to create risk-free profits by avoiding competition. More conspirators meant that the fraudulent scheme would be more difficult to detect, just as having more than one

bagman permitted a broker to make a number of fraudulent trades without running up an inordinately high volume of trades with any single trading partner. In *Townsend*, comparing a conspiracy to a corporation, we described this kind of conspiratorial cooperation:

> "[B]usiness combinations—whether corporations, partnerships, joint ventures, or other variations—exist because they lower the transaction costs of legitimate profit-seeking endeavors. Conspiracies exist for the same reason—to lower the transaction costs of committing crimes. Rather than having to discover who it is that one wishes to deal with, to inform people that one wishes to deal and on what terms, to conduct negotiations leading up to a bargain, to draw up the contract, to undertake the inspection needed to make sure that the terms of the contract are being observed and so on, in order to accomplish a goal—whether legitimate or illegitimate—corporations and conspiracies will emerge to organize what would otherwise be market transactions...."

*Id.* at 1394 (quotations omitted). This excerpt summarizes precisely the nature of the defendants' association.

*Townsend* makes clear that, in a challenge to the existence of a single conspiracy, "the critical question is whether the jury may reasonably *infer* a single agreement among the defendants from the evidence ... presented by the government." *Id.* at 1390 (emphasis in original). In the instant case, the district court specifically instructed the jury to consider whether the evidence established a single conspiracy:

> The government has charged all of the defendants in Count 1 of the Indictment with a single conspiracy to violate the RICO statute. You are instructed that proof of several separate conspiracies is not proof of the single, overall conspiracy alleged in Count 1, unless one of the several conspiracies which is charged is the single conspiracy which Count 1 of the Indictment charges. What you must do is to determine whether the single conspiracy charged in the Indictment ex-

isted between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants as to that charge. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.... In other words, to find a defendant guilty, you must find he was a member of the conspiracy charged in the Indictment and not some other, separate conspiracy.

Trans. at 7335–36. In light of our review of the record and the district court's careful instructions, we cannot say that the jury could not reasonably infer that the defendants joined a single conspiracy. There is sufficient evidence to withstand the defendants' challenge.

■ Nor do we believe that RICO, as applied in this case, is unconstitutionally vague. Both the defendants and the CBOT claim that the statute's "pattern" requirement—i.e. that the defendants' illegal acts constitute a "pattern of racketeering activity," *see* 18 U.S.C. § 1962(c)—is "so lacking in clarity as to be unconstitutional." *See* Defendants' Consolidated Brief at 46. We disagree. We have repeatedly rejected that suggestion, including in cases in which the enterprise was a legitimate entity. *See United States v. Sanders,* 962 F.2d 660, 678 (7th Cir.1992); *United States v. Masters,* 924 F.2d 1362, 1367 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991); *United States v. Glecier,* 923 F.2d 496, 497–98 n. 1, (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). With this authority, suffice it to say, as we did in *Glecier,* that the issue of RICO's vagueness has been

settled to our satisfaction. We reaffirm that the RICO statute is not unconstitutional despite Justice Scalia's statements concerning the pattern requirements in his concurrence in *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (Scalia, J., concurring).[4]

■ We similarly reject the defendants' remaining consolidated claims. The defendants argue that the district court erred in its instructions regarding their creation of false records and accommodation trading; that the trading-by-offset provision is unconstitutionally vague; that the court wrongly admitted prejudicial hearsay declarations that were not in furtherance of the conspiracy; and that the court erred in sentencing. Each of these claims runs against clear precedent and ample record evidence. For instance, when challenging their convictions for making false records under 7 U.S.C. § 6b(B), the defendants claim error in the court's refusal to instruct that false entries had to be material. These false record charges were premised upon the prosecution's assertion that the defendants falsely used a "K" time bracket designation for transactions conducted after the closing bell.[5] The defendants argue that the "K" designation was not material and that materiality was a necessary element of the offense.

■ The district court disagreed. It determined as a matter of law the elements of § 6b:

When you're talking about Section (B), to me, ... I don't know what is plainer than to say it is unlawful ... to, quote, "will-

---

4. The CBOT also suggests that the district court's instructions failed to apprise the jury that the pattern element of 18 U.S.C. § 1962 requires more than just two instances of fraud; it demands "continuity plus relationship." *See H.J., Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900. (citation omitted). *See also* CBOT Brief at 14. The CBOT is mistaken. In its instructions to the jury, the district court carefully outlined the meaning of a pattern of racketeering activity:

While two acts of racketeering activity are necessary, a finding of two such acts, in and of itself, may not be sufficient to constitute a pattern of racketeering activity. To find a pattern of racketeering, you must find that

there is a relationship between the agreed-upon racketeering acts and that there is a continuity with respect to those acts.

Trans. at 7337.

5. CBOT Rule 310.00 explicitly limits trading to the hours during which the exchange is open, specifically 9:30 a.m. to 1:15 p.m. Traders record the time at which a specific trade took place on their trading cards or order forms by listing one of the time brackets into which the CBOT divides the entire day. CBOT Rule 320.15 assigns each half-hour segment of the day a particular letter. The letter "K" indicates the time period 1:00 p.m. to 1:30 p.m.

fully make or cause to be made a false report." [quoting 7 U.S.C. § 6b(B)]. What that means to me is a simple thing. If you're making a report and you know that it is false, you are willfully making a false report, and it doesn't make any difference whether you are intending to cheat or defraud anybody or not.

Trans. at 6193. We believe that the district court correctly stated the dispositive principle of law. *See United States v. Jackson*, 836 F.2d 324, 329 (7th Cir.1987) (jury properly instructed that materiality of false oaths in bankruptcy proceeding already decided as a matter of law). Thus, the refusal to require the jury to find materiality was not error.[6]

The defendants' claim regarding accommodation trading suffers the same fate. They claim that the district court erred in refusing to instruct the jury that the misdemeanor offense of accommodation trading, *see* 7 U.S.C. § 6c(a)(3)(A), is a lesser included offense of filling by offset under § 6b(D). This claim represents an attempt to apply a test that has been explicitly rejected by the Supreme Court. In *Schmuck*, 489 U.S. at 705, 109 S.Ct. at 1443, the Court adopted the "elements test" for determining whether one offense is necessarily included within another. Under that test, a court is to compare statutory elements of the offenses to see whether the lesser offense requires an element that the greater does not; if the answer is "yes," no instruction is given. *See* 489 U.S. at 716, 109 S.Ct. at 1450.

The charged felony, filling by offset under § 6b(D), requires proof that a member of a contract market filled an order from one customer by offsetting it

against the order of another customer, and that he did so knowingly. To aid and abet that crime requires willful aiding, abetting, counselling, commanding, inducing, or procuring another to do so. 7 U.S.C. § 13c(a). Nevertheless, violation of the misdemeanor offense (§ 6c(a)(3)(A)) requires that a defendant conduct an "accommodation trade," which the district court defined as a transaction in which one trader cooperatively and non-competitively trades with another to avoid market risk "while giving the appearance that the trade has been executed in the competitive market." Trans. at 7359. When the statutes are compared, it is clear that the lesser offense requires proof of an element—a trade with a cooperating opposing trader—which is not required under the felony statute. Filling by offset, as defined in § 6b(D), does not require that any other trader cooperate with a broker in the deliberate offset of orders, while aiding and abetting offsetting does not require that the aider do so by conducting a cooperative trade. Thus, because "accommodation trading" requires an element not required in filling by offset, the former is not necessarily included in the latter. The district court properly denied the defendants' requested instruction.

The defendants further assert that the trading by offset prohibition is unconstitutionally vague as applied to the conduct described in the instant case.[7] The defendants cite *Nichols & Co. v. Secretary of Agriculture*, 136 F.2d 503 (1st Cir.1943) ("*Nichols II*"), to suggest that § 6b(D) is vague, even though no constitutional claim was raised in that case. In the case's two opinions, the First Circuit initially decided that one firm's offsetting orders in the pit

---

**6.** The defendants also argue that the evidence was insufficient to support their convictions for creating false records. We disagree. That customer confirmation statements do not include time bracket information and that trades may clear without brackets being listed on the cards or orders does not undermine the significance of the *traders'* use of false brackets to avoid scrutiny. As the district court observed (*see* Trans. at 5631–32, 5639), even if a trade may clear with no time bracket listed, it would not clear if the traders had indicated that the trade occurred after the closing bell.

**7.** The filling by offset prohibition reads,

It shall be unlawful ... to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person. 7 U.S.C. § 6b(D).

violated the statute. *Nichols & Co. v. Secretary of Agriculture*, 131 F.2d 651, 658 (1st Cir.1942). Nevertheless, on rehearing the court could not say that the handling of the orders came within the statute because they were executed by open outcry. In this case, the defendants offset their customer orders without entering the competitive marketplace through open outcry. While *Nichols II* discussed whether allied brokers could be prosecuted for trading against each other competitively, the defendants in this case deliberately matched orders outside of the market. We discern no constitutional vagueness. On the contrary, the record suggests that defendants' matching of orders fell within the core of the statute's prohibition. *See also In Re Gimbel*, Comm.Fut.L.Rep. (CCH) ¶ 24,213, at pp. 35,003–04 (CFTC, April 14, 1988) (CFTC defines the offsetting violation as "a prearranged transaction in the pit ... structured to produce an offset of customer orders...." (citation omitted)).

■ The defendants also challenge the admission of three conversations, claiming that they were not coconspirators' statements under Federal Rule of Evidence 801(d)(2)(E).[8] We previously have determined that we review only for clear error a district court's finding that a particular statement was made in furtherance of the conspiracy. *United States v. Doerr*, 886 F.2d 944, 952 (7th Cir.1989). In addition, a district court may conclude that the challenged statement was "in furtherance" even though the statement was susceptible of alternative interpretations. *Id.* (quotations omitted).

In the first challenged conversation, Agent Ostrom and an unindicted trader were discussing a proposed CBOT rule change that would bar local traders from trading on "limit up" and "limit down" days. Ostrom said that because they were members, locals had an unfair advantage over customers. *See* Trans. at 1504. Defendant Vercillo interrupted the conversa-

tion and said, "F—— the customer." *Id.* In the second challenged conversation, Ostrom and defendant Ashman were discussing an out-trade, and Ashman said that he would pay the error by check. Ostrom responded, "We'll let John Q. Public pay me." *See id.* at 1736–37. Another unindicted coconspirator made the third challenged statement. The coconspirator interrupted Ostrom and defendant Nowak during illegal trades, and, pretending to tape them, said, "Can you speak up? The prosecuting attorney can't hear you." *Id.* at 1075.

The district court admitted these statements as furthering the conspiracy and demonstrating both the breadth of its membership and the defendants' knowledge of its criminal nature. The defendants argue that these conversations were not in furtherance of the conspiracy and, thus, should not have been admitted. We disagree. The district court had a reasonable basis to conclude that one conspirator's statements describing the purpose, method, or criminality of the conspiracy was not idle and furthered the scheme. The defendants' claims that the statements were taken out of context was a question for the jury to resolve, and is therefore lost on appeal. We hold that the district court's admission of the coconspirator statements was not clear error.

■ The defendants also claim that the district court erred in sentencing. Specifically, they argue that Sentencing Guideline 2E1.1, under which eight of the defendants (all save Ryan and Barcal) were sentenced for RICO conspiracy, conflicts with the Guidelines' enabling legislation (i.e. that, in promulgating 2E1.1, the Sentencing Commission failed to follow Congressional direction to maintain flexibility for individualized mitigating or aggravating factors), and that the district court erred by adding a two-level enhancement to the base offense levels of the local defendants (Barcal,

---

8. Rule 801(d)(2)(E) provides:
    (d) *Statements which are not hearsay.* A statement is not hearsay if—
      (2) *Admission by party-opponent.* The statement is offered against a party and is

    (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Bergstrom, Fetchenhier, Schneider, and Vercillo) for the use of a special skill under Guideline 3B1.3. Neither claim has merit. First, the defendants' contention that Guideline 2E1.1 unfairly provides a high minimum base offense level and then fails to set forth specific aggravating or mitigating factors runs against the express intent of Congress in making RICO a weighty offense. As the district court observed, the very structure of the statute demonstrates that Congress has decided that a RICO conspiracy is a specific, identifiable crime apart from any underlying predicates. *See United States v. Dempsey*, 768 F.Supp. at 1281.

■ Second, the defendants' claim that the ability to trade at the CBOT is not a "special skill" is similarly rejected. The Commentary to Guideline 3B1.3 defines a "special skill" as one "not possessed by members of the general public and usually requiring substantial education, training or licensing." The defendants, as CBOT traders, were subject to both training and testing, including a three-day set of seminars complete with examination and registration by the National Futures Association. *See* Trans. at 452–53. We have no difficulty concluding that the defendants possessed a special skill under Guideline 3B1.3. *See United States v. Connell*, 960 F.2d 191, 198–99 (1st Cir.1992) (registered stockbroker who had undergone special training and met certain licensing requirements possesses a "special skill" necessary to support an upward adjustment).

■ The defendants' only remaining consolidated claim that merits discussion asserts that the district court erroneously denied their motion for mistrial because the government failed to call witnesses whose testimony it had described in its opening statement. Here's what happened: at the beginning of the trial, the prosecutor told the jury that four others who had pleaded guilty (traders Bruce Mittelstadt, Kenneth

Gillen, Harry Patten, and clerk Michael Weiser) would testify for the government. The prosecutor then described what he expected those witnesses to say during the trial.[9] Nevertheless, the government never called these four witnesses to the stand. At the close of all the evidence, the defendants' moved for mistrial. The district court denied the motion. *See* Trans. at 6414.

During their closing arguments, the defendants repeatedly pointed to the missing witnesses to support their contention that the government failed to prove its case. *See, e.g.*, Trans. at 6773, 6861, 6864, 6911–12. In rebuttal, the government responded:

> [Defense counsel] want to know where are Mittelstadt, Patten and Weiser. What would they add to this case except more time.... We have the burden of proof at all times. We welcome that burden. But if the questions were so important, they could ask them. If the documents were so telling, they could produce them. And if a witness is so helpful, they could call him.

Trans. at 7278. On appeal, the defendants contend that, given the prosecutor's statements in his opening and during rebuttal, the district court erred in denying their motion for mistrial. We disagree. Over the course of a three-month trial, this slight variance between the government's opening argument and its proofs do not amount to reversible error, and therefore, we cannot say that the district court abused its discretion in denying the defendants' motion. *See United States v. Novak*, 918 F.2d 107, 108 (10th Cir.1990) ("The decision to deny a motion for a mistrial is within the discretion of the trial court judge and we will reverse only if there is a showing that the trial court judge abused that discretion.").

■ Put simply, we do not believe that the prosecutor's statements "under-

---

9. For example, the prosecutor told the jury that Michael Weiser had pleaded guilty and that he had seen certain defendants keep "cheat cards" on which they "ke[pt] track of the illegal money gained from rip offs of customers...." Trans. at 669–70. The prosecutor then explained ar-

ranged trading and stated, "That, Ladies and Gentlemen, is pre-arrangement and ripping off customers. And that was one of the ways that Nowak and Bergstrom cheated customers. And Weiser will testify about that." *Id.* at 672.

mined the fairness of the trial or contributed to a miscarriage of justice." *United States v. Obregon*, 893 F.2d 1307, 1310 (11th Cir.1990). As we have remarked in the past, litigants are entitled to a fair trial, not a perfect one. *See United States v. Fountain*, 768 F.2d 790, 797 (7th Cir.1985). And a fair trial is precisely what the ten defendants received in the instant case.[10] The jurors repeatedly were instructed that opening statements were not evidence. *See e.g.* Trans. at 548, 551, 7322. The prosecutor blunted the impact of his remarks during rebuttal by properly reminding the jury that the burden of proof rested solely upon the government. Nor did the prosecutor reveal during the opening argument or rebuttal any critically damaging information that was not available to the jury. For instance, that the prosecutor mentioned during opening argument that the missing witnesses had pleaded guilty did not jeopardize the trial's fairness. The jury properly had been told of the guilty pleas and testimony of defendants Eggum, Nowak, and Skrodzki—three witnesses who, in fact, testified. While we may agree that the prosecutor's statements—particularly those made during rebuttal—would have been better left unsaid, we do not believe that the prosecutor's mistake warrants reversal.[11]

## B. Individual Claims

We now turn to consider the individual claims of each defendant. Because several defendants essentially argue identical positions, we will group similar claims whenever possible.

■ Defendants Vercillo, Ashman, and Fetchenhier claim that the evidence was insufficient to support their convictions for RICO conspiracy. Again, we view the evidence, with all reasonable inferences, in the light most favorable to the government, and will uphold the jury's verdict if any rational juror could have found guilt beyond a reasonable doubt. *United States v. Aguilar*, 948 F.2d 392, 395 (7th Cir.1991). No direct proof of a formal agreement to conspire is required; we will sustain the verdict if membership in the conspiracy may reasonably be inferred from circumstantial evidence of the relationships among parties, their actions, and "the totality of their conduct." *United States v. Jones*, 950 F.2d 1309, 1313 (7th Cir.1991) (quoting *United States v. Redwine*, 715 F.2d 315, 320 (7th Cir.1983), *cert. denied sub nom., Strong v. United States*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)).

■ As we made clear when we discussed the existence of a single conspiracy, *see supra* at 484–87, the record provides ample evidence that each defendant, including Vercillo, Ashman, and Fetchenhier, agreed to commit a pattern of racketeering activity. Their convictions on two or more predicate fraud counts, while not necessary

10. Among his individual claims, defendant Vercillo argues that he was unfairly prejudiced by the prosecutor's remarks during rebuttal. For instance, he challenges the "improper hyperbole" the prosecutor employed when he told the jury that the federal undercover agents investigating the case previously had fought against terrorists (*see* Trans. at 7247, 7282) and when he compared the defendants' crimes to public corruption (*see id.* at 7240). We see nothing improper in the prosecutor's remarks. References to the agents' prior work were brief and were made in response to suggestions that the agents had lied under oath. Moreover, the prosecutor accused no defendant of anything beyond what was charged in the indictment. Vercillo's claim, then, is rejected.

11. We note, however, that the government easily can avoid this type of mistake in the future by adhering to the following trial procedure: if the government wishes to end its case-in-chief without calling all the witnesses mentioned in its opening argument, then the prosecutor should request a sidebar before resting, and inform the judge and defense counsel of his intention to end the government's case-in-chief before calling all witnesses. The prosecutor should tell the judge that if the defense intends to comment on the missing witnesses, then the government will produce those witnesses and extend the length of the trial; but if the defense will agree not to comment on the missing witnesses, then the government happily will rest upon the evidence already presented. If this procedure had been followed, then neither the government nor this court would be faced with a claim for mistrial due to prosecutorial misconduct.

to show conspiracy, support the jury's finding that the defendants conspired to violate the law. *See United States v. Melton*, 689 F.2d 679, 683 (7th Cir.1982) ("[W]hen the evidence establishes that the defendants committed during a time period several acts of racketeering in furtherance of the affairs of the enterprise, an inference of an agreement to do so may be drawn." (quotations omitted)). The record shows that Vercillo, Ashman, and Fetchenhier were well aware that they were part of an ongoing and flexible agreement to commit fraud as the need—or perhaps the opportunity—arose.

For example, when Nowak had trouble picking a price for a trade with Agent Ostrom, it was Vercillo who suggested that the prices be set to give Ostrom the maximum available profit (i.e. the highest buy price or lowest sell price). *See* Trans. 1586, 4208–13, 4236–37, 4505–10. Vercillo was one of Nowak's "bagmen," as were Bergstrom, Fetchenhier, and Agent Ostrom. The record even describes instances in which both Vercillo and Nowak acted as bagmen for another unindicted trader. *See id.* 1663–64, 4498–99. Similarly, Fetchenhier accepted losses from Nowak under the same conditions, and with same method of repayment, that is, from customers' orders. *See id.* at 935–36, 962–64, 985–88. Ashman followed the same procedures: he had locals absorb losses from broker errors and then matched customer orders profitably to cover them.[12] *See id.* 1107–14, 1560–61, 3139–42. From this evidence, a rational juror could indeed have inferred that Vercillo, Ashman, and Fetchenhier agreed to commit a pattern of racketeering activity.

■ Defendant Cox claims that the district court erred in admitting records that showed non-indicted instances where he profitably matched orders with local traders and then received about half the profits through prearranged trades. *See id.* 6270–6368. Cox argues that these transactions were not admissible under Federal Rule of Evidence 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). The government contends that these additional transactions were not Rule 404(b) evidence, but instead were used to impeach Cox's assertion that the pattern of charged acts (i.e. profitable matches followed by a return of profits) was merely a coincidence. *See* Government's Brief at 98. In *Glecier*, 923 F.2d at 503 (citing Matthew 19:24), cited with approval in *Smith v. Great American Restaurants*, 969 F.2d 430 (7th Cir.1992) (Cudahy, J.), we declared that defendants who challenge evidentiary rulings on appeal "are like rich men who wish to enter the Kingdom; their prospects compare with those of camels who wish to pass through the eye of a needle." Given the deference we give to the district court's evidentiary decisions, we cannot say that the admission of the uncharged records constitutes error. At trial, Cox objected only to the relevance and materiality of the additional transactions. *See* Trans. at 6406. But, as we declared in *United States v. Manso–Portes*, 867 F.2d 422, 426 (7th Cir.1989), "The specific premise for reversing upon appeal an evidentiary ruling must be the same premise as that declared properly in the objection during trial." When a defendant asserts a different evidentiary premise on appeal, we will reverse only for plain error. *Id.* at 427. We do not find that error in this instance. Cox's claim is rejected.

■ Defendants Barcal and Ryan argue that the district court improperly declined to sever their trials. Barcal claims that the testimony of his co-defendants, specifically Ashman and Cox, was "diametrically opposed and antagonistic to [his] defenses." Barcal's Brief at 8. The nature of this antagonism lies in Barcal's denial of any wrongdoing, including after-hours trading

---

12. Ashman also claims that the evidence was insufficient for the jury to find that orders were matched in the two mail fraud counts on which he was convicted. Ashman attacks as deficient the testimony of co-defendant Eggum, the broker in both transactions. Suffice it to say that the jury was entitled to believe Eggum's testimony. Moreover, on cross-examination, Eggum rejected the contention that he had no memory of the trades and was simply interpreting the records. *See* Trans. at 3444–45. We see no reason the disturb the jury's decision.

(known as "trading on the curb") and other violations of CBOT rules. Ashman and Cox, however, testified that violations of CBOT rules were a common occurrence. For instance, Cox acknowledged curb trading thirty to forty times, and stated that he daily observed others trade on the curb. *See* Trans. at 6017; Cox's Brief at 4. Ashman testified to the existence of a "curb market." *See* Trans. at 5388; Barcal's Brief at 8. Ryan's claim for severance rests upon the fact that he was the only defendant not charged under RICO. Ryan contends that he was only a "bit player" in this tragedy and that, due to the lengthy presentation of evidence against his co-defendants, he would not be able to differentiate himself in the minds of the jurors. *See* Ryan's Brief at 5.

Nevertheless, the burden these defendants carry on appeal when challenging a denial of severance is heavy. As we previously have declared,

> [Federal Rule of Criminal Procedure] 14 permits the trial court in the exercise of its discretion to grant separate trials when the interests of justice so require. A district court's ruling on a Rule 14 severance motion will be overturned only upon a showing of abuse of discretion. Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal the district court abused its discretion.

*United States v. Moya–Gomez*, 860 F.2d 706, 766 (7th Cir.1988). *Moya–Gomez* made clear that, for the defendant to be successful, he must establish actual prejudice resulting from the denial for severance. *Id.* "Actual prejudice means that the defendant could not have a fair trial without severance, not merely that a sepa-

rate trial would offer him a better chance of acquittal." *Id.* (quotations omitted).

Neither Barcal nor Ryan can satisfy their burdens. Surely it is obvious that this case involved complex factual situations; the parties spent significant time educating the jury about trading futures contracts at the CBOT. The district court did not abuse its discretion by deciding to try Ryan with his co-defendants rather than select and train a separate jury for him. Nor do we find that Barcal's defense was antagonistic to the testimony of fellow defendants, specifically Ashman and Cox. Neither Ashman nor Cox admitted to fraud, nor did they accuse Barcal of any crime. Essentially both Ryan and Barcal claim that they were unfairly victimized by "spillover effects" resulting from the evidence amassed against their co-defendants. The individualized jury verdicts belie this suggestion. Of four mail and wire fraud counts, Ryan was convicted on one and acquitted on three. Similarly, Barcal was acquitted of RICO conspiracy despite convictions on nine predicate mail fraud counts. He was also acquitted on three of seven false record charges, one of ten fill-by-offset charges, and his only accommodation trading count. The jury would not have rendered these verdicts if Ryan and Barcal had been lost in the crowd of co-defendants.[13]

■ Defendant Dempsey claims that the district court erred in denying his motion to call the prosecutor as a witness at the trial. According to Dempsey, the government tried to prove his intent to defraud through an oral statement made during his initial interview by prosecutors and FBI agents, in which he allegedly admitted that he knew that his actions were illegal. *See* Dempsey's Brief at 3. During the government's case, when Dempsey's counsel cross-examined Nowak about his interview with agents and prosecutors, Nowak stated

---

13. Barcal also argues that the prosecution violated his due process guarantees by vindictively charging him with RICO conspiracy in superseding indictments after he pleaded not guilty to the original indictment which did not include the conspiracy charge. Defense counsel asserts, "Perhaps, the Government was vindic-

tive ... because [Barcal] was the only trader who knew that Richard Carlson was, in fact, an undercover FBI agent (named Richard Ostrom)." Barcal's Brief at 5. Barcal offers nothing to support his contention. Moreover, Barcal was acquitted of RICO conspiracy. His claim is moot.

that the lead prosecutor in the case along with FBI agents Ostrom and Jeffrey Frank had told him that his lifestyle, his family's welfare, and the ownership of his CBOT membership "could be dramatically affected by what [he] chose to do." *See* Trans. 4283–86. Agent Frank testified that no threats were made. *See id.* 5265. During the defense case, Dempsey, whose initial interview also was conducted by the lead prosecutor as well as Agents Ostrom and Frank, did not call Ostrom to the stand, but instead asked to call the lead prosecutor to testify about what occurred at Nowak's initial interview. *See id.* 6315–18. Dempsey claims that the lead prosecutor's testimony was necessary to resolve the issue of whether threats were made at these initial interviews.[14]

■ A decision denying a motion to call a prosecutor as a witness falls within the district court's discretion. *United States v. Watson*, 952 F.2d 982, 986 (8th Cir.1991). We will not reverse the district court's ruling on such a motion "absent a clear and prejudicial abuse of discretion." *Id.* (quoting *United States Environmental Protection Agency v. City of Green Forest*, 921 F.2d 1394, 1409 (8th Cir.1990)). We see no such abuse in this instance. There has been no showing that the testimony of the lead prosecutor was necessary to Dempsey's case, or that similar information could not have been obtained from another source. *See Watson*, 952 F.2d at 986 ("The party seeking such testimony must demonstrate that the evidence is vital to his case, and that his inability to present the same or

similar facts from another source creates a compelling need for the testimony."). Here, Ostrom attended the interview and could have been called to testify. Dempsey argues in his reply brief that, because Ostrom was also an FBI agent and maintained a close friendship with Agent Frank, "the 'quality' of the alternate source was, thus, highly suspect." Dempsey's Reply Brief at 2–3. Such an argument amounts to little more than a presumption that Agent Ostrom would lie because of his association with Agent Frank. This just is not enough to demonstrate an inability to obtain the information from another source. The district court acted within its discretion.[15]

■ Of the defendants' remaining claims, only three deserve specific attention. First, Bergstrom challenges the sufficiency of the evidence supporting his conviction for aiding and abetting broker Middelstadt to cheat and defraud a customer in violation of 7 U.S.C. §§ 6b(A) and 13c(a).[16] Section 6b(A) provides:

> It shall be unlawful ... for any member of a contract market ... in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any person
>
> (A) to cheat or defraud or attempt to cheat or defraud such other person.

7 U.S.C. § 6b(A). Bergstrom argues that the evidence of his guilt under this statute fails because it consisted entirely of Agent

---

**14.** Dempsey states that Nowak admitted that the lead prosecutor and the agents "threatened" him (i.e. Nowak) during the initial interview. *See* Dempsey's Brief at 6. From our review of the record, we observe that Nowak never admitted to being "threatened." That particular word was not used. Nevertheless, Nowak did portray a rather frightful first meeting between the prosecutors, the FBI agents, and the defendants. Thus, the conflict on which Dempsey bases his need for the prosecutor's testimony is between Frank's claim that no threats were made and Nowak's description of a particularly intimidating interview.

**15.** The court also acted within its discretion when it held that the prosecutor's brief discus-

sion of the conflicting testimonies during rebuttal did not cause a mistrial. Dempsey argues that by mentioning the incident, the prosecutor became an unsworn witness who was not available to be cross-examined. We disagree. The prosecutor followed the district court's admonition to restrict his comments only to matters on the record. Because the prosecutor made no reference to his presence at the interview or his personal knowledge of the incident, the district court did not abuse its discretion.

**16.** Because Mittelstadt's customer was a CBOT member who did not receive his confirmation statement by mail or wire, the government charged him under § 6b rather than with mail or wire fraud.

Ostrom's observations. We disagree. As we have reiterated, we only will reverse a jury's verdict if no rational juror could have found guilt beyond a reasonable doubt. *Aguilar*, 948 F.2d at 395. The testimony Ostrom provided was enough for the jury to conclude that Bergstrom violated § 6b. The agent testified that he observed Mittelstadt execute a buy order by directing Bergstrom to sell at a slightly higher price than what was being traded in the market. Ostrom then heard Mittelstadt tell Bergstrom that he gave Bergstrom the trade because he owed Bergstrom money. *See* Trans. at 1278–81. Bergstrom's trading card showed that he gained $500. With this evidence, a rational juror certainly could have found Bergstrom guilty of violating § 6b.

■ Second, both Barcal and Schneider claim that the district court improperly quashed Barcal's subpoena of John Eggum's attorney. Eggum pleaded guilty and testified at trial for the government. *See* Barcal's Brief at 12–13; Schneider's Brief at 14–15. The subpoena sought to obtain counsel's notes and memoranda regarding meetings between Eggum and the attorneys for the government. *See* Trans. at 3015. Schneider argues that, because Eggum's testimony at trial was based upon his reconstruction of records rather than on his own recollections, Eggum's counsel's notes of his meetings with prosecutors "might have assisted in refreshing his recollection and disclosing the process by [which] his 'memory' was reconstructed." Schneider's Brief at 14–15. Counsel moved to quash, asserting attorney-client and work-product privileges. The district court granted counsel's motion and declined *in camera* review. The court accepted counsel's representation that her materials did not record Eggum's statements and contained only her analyses, thoughts, and strategies. *See* Trans. at 3015–22.

In *United States v. Valona*, 834 F.2d 1334, 1341 (7th Cir.1987), in which a defendant sought access to the government's files, we determined that discovery issues are committed to the sound discretion of the district court: "Under the abuse of discretion standard, the relevant inquiry is

not how the reviewing judges would have ruled ... but rather, whether any reasonable person could agree with the district court." *Id. See also United States v. Arditti*, 955 F.2d 331, 345 (5th Cir.1992) ("We review a grant of a motion to quash a subpoena for abuse of discretion."); *United States v. Phillips*, 854 F.2d 273, 277 (7th Cir.1988) ("Generally, the decision whether to conduct an *in camera* review of government files in appropriate cases, whether to require discovery of materials contained therein, and in what form such materials should be produced are committed to the sound discretion of the district judge."). Moreover, Federal Rule of Criminal Procedure 17(c) restricts subpoenas to specified, evidentiary items that are relevant and admissible. *Arditti*, 955 F.2d at 345–46. Without that requisite specificity, the district court in the instant case found that Barcal's subpoena was "fishing" for exculpatory information. *See* Trans. at 3019. *See also Upjohn Co. v. United States*, 449 U.S. 383, 399, 101 S.Ct. 677, 687, 66 L.Ed.2d 584 (1981) ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes."). We observe that the defendants extensively cross-examined Eggum on his testimony. Therefore, the district court committed no abuse of discretion by rejecting the defendants' attempt to obtain the notes of Eggum's counsel through subpoena.

■ Finally, all the defendants claim that this court's April 29, 1992 order, *see United States v. Ashman*, 964 F.2d 596 (7th Cir.1992), which established page limits for both the consolidated and individual briefs, and sanctioned defendants' attorneys for the abuse of court processes, deprived them of their right to a meaningful appeal. *See* Defendants' Consolidated Brief at 73. In our April 29 order, we explained our reasons for setting page limits and sanctioning counsel:

By order of June 26, 1991, we consolidated the appeals and "encouraged" the appellants "to avoid unnecessary duplication by filing a joint brief or a joint

appendix or by adopting parts of a co-appellant's brief." And lest the meaning of "encouragement" be misunderstood we added: "Duplicative briefing will be stricken and may result in disciplinary sanctions against counsel." ... The briefs [originally] filed by the appellants are replete with duplication. The consolidated introductory brief contains no argument section at all. Rather than consolidate and streamline their presentation, the appellants have inundated the court with redundant and uncoordinated filings.

*Ashman,* 964 F.2d at 597–98. We struck the defendants' briefs, ordered the submission of a single consolidated brief not to exceed seventy-five pages, permitted each defendant to submit an additional brief not to exceed twelve pages, and, as a sanction, forbade the defendants' attorneys from charging their clients for the preparation of the stricken briefs. *Id.* In a June 18, 1992 order, however, we unanimously lifted the sanction against the defendants' attorneys.

The defendants now argue that the April 29 order establishing page limits for the consolidated and individual briefs deprived them of effective representation on appeal. We disagree. The submitted briefs competently presented the claims and arguments of each party without unnecessary duplication. In appeals like this, where a multi-defendant conspiracy challenges their convictions, it is inevitable that some defendants will raise identical claims. The instant case is no exception. We hold that our April 29 order did not deprive the defendants of a meaningful appeal.

The defendants' remaining claims—most of which challenge the sufficiency of the evidence supporting convictions on certain counts—are without merit. As we declared in *United States v. Teague,* 956 F.2d 1427 (7th Cir.1992), a defendant

faces a nearly insurmountable hurdle when attacking the sufficiency of evidence on appeal, even if we were to give the claim full consideration, for the standard of review is extremely deferential. Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.

*Id.* at 1433 (quotations omitted). In each of the defendants' challenges—save one— there was sufficient evidence for the jury to convict. On count 141, however, the government wisely concedes that the record does not reflect any evidence demonstrating that defendant Kenney improperly offset a particular sell order with a corresponding buy order. *See* Trans. at 1292, 1294–96. *See also* Kenney's Brief at 14; Government's Brief at 84 n. 52. Therefore, both Kenney's and Dempsey's convictions on that count are reversed.

For all the foregoing reasons, we AFFIRM IN PART and REVERSE IN PART. Specifically, we reverse the relevant defendants' convictions on all limit-up or limit-down transactions because of the absence of any deprivation of customers' property. We also reverse convictions under count 141 due to a failure of proof. We affirm all remaining convictions and reject the defendants' challenges to their sentences. We remand this case to the district court to enter the appropriate orders and changes in sentences made necessary by our opinion.[17]

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

My differences with Chief Judge Bauer's incisive opinion for the majority are narrow and I write separately only to make a few essential points. The majority opinion deals admirably with the *principles* that

---

17. As our opinion explains, we reverse the relevant defendants' mail and wire fraud convictions on those counts that involve limit-day orders. The defendants' consolidated brief at Appendix A sets out the three particular traders, Kenney, Dempsey, and Bergstrom, who were convicted for limit-day transactions. The Appendix also identifies the particular counts: 140,

142, 158, 176, 185, 186. The government appears not to challenge this list of relevant traders and counts. We also reverse the convictions under count 141. The defendants' Appendix lists Kenney and Dempsey as the traders convicted under count 141. The government agrees. *See* Government's Brief at 84 n. 52.

should define fraud in arranged transactions on the trading floor. As to the broad concepts, therefore, I have no quarrel with the majority, but in application a more precise analysis seems to be required.

The majority has correctly rejected the argument that trading in a mode other than open outcry is fraudulent *per se* (although, of course, it is a violation of the rules of the Chicago Board of Trade and of the Commodities Exchange Act). It is reasonably clear, however, that, when an arranged trade has generated a "surplus" to be passed on to another party, to be credited against past losses or to be retained for use against future losses, there is sufficient evidence to support a jury verdict of guilt. Nonetheless, the government bears the burden of proving beyond a reasonable doubt that each individual defendant specifically intended to perpetrate a fraud. The majority, I think, errs by failing to consider the specific evidence against each defendant.

As the majority opinion indicates, the trades involved here were not made at "scratch" and hence presumably involved some profit to the trader. In ordinary course, one may assume that a profit as such is not necessarily an indicator of fraud since in general some profit is required to cover transaction costs. The existence of transaction costs is the reason all trading, whether by open outcry, by matching or otherwise must, in the long run, generate a profit. But beyond the profit ordinarily generated by trading, there is in the case of fraudulent transactions, what I would call an identifiable "surplus" available to be kicked back to compensate for losses or otherwise to be applied for the benefit of someone other than the customer. It is to the generation and application of such a surplus that I would look for evidence of fraud.

As to the mail fraud counts, I find the majority's theory of culpability to be most clearly stated as follows: "By picking customer prices and opposing traders, the defendants removed their customers from the pit's competitive marketplace and forced the customers to accept the results they selected, guaranteeing profits to the local and denying the customer the opportunity to obtain a better price." *Ante* at 477–78. Although this general statement may accurately describe the operations of most of the defendants, the majority's formulation fails to differentiate those trades in which an identifiable surplus was applied for a trader's benefit, from trades where there is no evidence of such a surplus. Of course, in both circumstances there was a violation of CBOT rules and of the CEA; however, fraudulent intent may be inferred from the first-described circumstances but not from the second.

In this connection, the Government's own witnesses testified that customers placed MOO and MOC orders for purposes other than obtaining the most favorable price. For example, Charlotte Ohlmiller testified that an MOC order is typically made by customers "looking for a fill," e.g., by customers desiring to have a sell order executed at the closing price, usually to close out their market position, but not by those seeking a particular (high) price. Tr. vol. 15, p. 65 (Ohlmiller direct); Tr. vol. 13, p. 294 (Ohlmiller, cross by Shine). *See also* Tr. vol. 21, p. 3243 (Eggum direct) ("Q: Mr. Eggum, when a customer puts in a request for an order to fill a market on close, is that customer specifying a price that he wishes? A: No. Q: What is the customer's specified request on an MOC order? A: He's specifying the time that he wants the order filled."). Consequently, when executing MOC orders, traders are trying to carry out their customers' instructions, usually to reduce the customers' market exposure. It was this wish by customers to reduce risk that led some of the appellants to "trade on the curb," i.e., after authorized trading hours. Some traders, however, including many of those convicted here, may have engaged in such trading to generate excess profits—as well as to serve their customers' timing requirements. Therefore, curb trading on MOC and MOO orders can reasonably be explained on the basis of fraudulent as well as honest intent. Hence, the issue is what kind of evidence is sufficient to entitle a

jury to reject honesty as an explanation and to accept fraud.

Many of the trades cited by the majority as examples of presumptively fraudulent transactions involve evidence of identifiable surpluses applied for the benefit of a party other than the customer. I quite agree that, as to these trades, the evidence is sufficient. But there are some trades where there is no evidence of (1) a price deviating from the auction market in a direction adverse to the customer or (2) an identifiable surplus applied for the benefit of someone other than the customer. For example, appellant Ashman was convicted of "matching" MOO and MOC orders on the curb.[1] Ashman presumably made a profit on these transactions, but there is no evidence that he realized more than he could have had the trades been made by open outcry. There is also no evidence that any of the other participants in the transaction owed Ashman anything and that the trade was intended to reduce their indebtedness. This evidence is in contrast to that against, for example, appellant Schneider. In Schneider's case, there is clear evidence that a portion of the profits was kicked back to other transaction participants. The existence of this identifiable "surplus," which was kicked back, supports an inference of fraud. Many more traders here resemble Schneider's situation than resemble Ashman's.

It is not enough that failure to trade by open outcry deprives a customer of an opportunity to receive the best price, for such a failure may just as well relieve the customer of the risk of getting the worst price. Many of the examples given by the majority involve money applied for the benefit of someone other than the customer. But from these examples, we should not extrapolate to the conclusion that "the jury had ample basis to conclude that [all] the defendants manipulated orders with the intent to deprive customers of better prices so that they could generate profits for themselves." *Ante* at 481. Therefore, I

would require a showing of an identifiable surplus, as to each appellant, applied for a purpose other than the customer's benefit. The vast majority of these convictions meet this criterion, but a few do not and I think that the difference must be accounted for.

Accordingly, I respectfully dissent on this point to the extent indicated.

With respect to the adequacy of the mailings here to support mail fraud convictions, Judge Wood's opinion in *United States v. Biesiadecki*, 933 F.2d 539, 545 (7th Cir. 1991) seems to be an adequate precedent. But I do not believe that *United States v. Schmuck*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), upon which *Biesiadecki* relied, is entirely on point. There the mailings were essential to the fraud on an ongoing basis, i.e., the retail dealer had to use the mails to transfer title to his retail customers if he was to continue buying cars from Schmuck. Here the mailing of confirmations was not integral to the fraud in any way. The confirmations did not purport to convey any information on *how* the trades were carried out—merely that the trades had been executed and what the resulting prices were.

I do not think one can say that the confirmations were deficient in failing to disclose that the trades were not carried on by open outcry. A confirmation says nothing about the method of trading, and no one looks to it to disclose information on this subject. If anything, by reporting the prices at which the trades were actually made— prices somewhat adverse to the customers' interests—the confirmations might have had some tendency to alert customers to the trading improprieties. This would be precisely the reverse of the lulling effect that the majority thinks is dispositive.

As I have indicated, I think *Biesiadecki* controls and supports the majority opinion. But there seems to be no limitation at this point on a "lulling effect" theory. Any routine mailing in any way connected with the fraudulent activity seems to be "lull-

---

**1.** In the context of this litigation, "matching" occurred when two brokers, one holding buy orders and the other holding sell orders (or a single broker holding both), fill both the buy and sell orders with a single local in equal quantities at prices the broker had dictated, rather than by open outcry. Matching typically occurred on the curb.

ing." *Not* to mail confirmations here would suggest to the customers that the trades had not been made, *not* that they *were* made but at phony prices. The "lulling" rationale thus knows no real limits, but after *United States v. Biesiadecki,* this may be inevitable.